```
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,           )   Docket No. 13 CR 731
 4                                       )
                         Plaintiff,      )
 5                                       )
                   vs.                   )
 6                                       )
     H. TY WARNER,                       )   Chicago, Illinois
 7                                       )   January 14, 2014
                         Defendant.      )   10:00 o'clock a.m.
 8

 9              TRANSCRIPT OF PROCEEDINGS - SENTENCING
             BEFORE THE HONORABLE CHARLES P. KOCORAS
10

11   APPEARANCES:

12

13   For the Plaintiff:       HON. ZACHARY FARDON
                              United States Attorney
                              BY:  MS. MICHELLE PETERSON
14                                 MR. JAMES M. CONWAY
                              219 S. Dearborn St., Suite 500
15                            Chicago, Illinois  60604

16
     For the Defendant:       SCANDAGLIA & RYAN
17                            BY:  MR. GREGORY J. SCANDAGLIA
                              55 E. Monroe St., Suite 3440
18                            Chicago, Illinois  60603

19
     Also Present:            MR. MICHAEL ALPER, Probation Officer
20

21   Court Reporter:          MS. JOENE HANHARDT
                              Official Court Reporter
22                            219 S. Dearborn Street, Suite 1744-A
                              Chicago, Illinois  60604
23                            (312) 435-6874
                    * * * * * * * * * * * * * * * * * *
24                        PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1                THE CLERK:  13 CR 731, U.S. vs. H. Ty Warner.
 2    Sentencing.
 3                MS. PETERSEN:  Good morning, your Honor, Michelle
 4    Peterson and Patrick King for the United States.
 5                THE COURT:  Good morning.
 6                MR. KING:  Good morning.
 7                MR. SCANDAGLIA:  Good morning, your Honor, Greg
 8    Scandaglia on behalf of Mr. Ty Warner.
 9                THE COURT:  Good morning.
10                THE PROBATION OFFICER:  Good morning, your Honor,
11    Michael Alper on behalf of U.S. Probation.
12                THE COURT:  Good morning.
13                The first order of business is to talk about the
14    information that we have received in this case.  First, the
15    Presentence Report prepared by Mr. Alper.
16                Have you all had a chance to look at that?
17                MS. PETERSEN:  Yes, your Honor.
18                MR. SCANDAGLIA:  Yes, your Honor.
19                THE COURT:  And is there anything --
20                Mr. Warner, have you had a chance to read that report?
21                THE DEFENDANT:  Yes, your Honor.
22                THE COURT:  And have you had a chance to discuss it
23    with your counsel?
24                THE DEFENDANT:  Yes, your Honor, I have.
25                THE COURT:  Is there anything of a major proportion
```

1   that anybody wants to correct?

2            I know the government had some things.  I am not sure

3   how fundamental they are, but --

4            MS. PETERSEN:  Yes, your Honor.

5            Actually, the government has a correction to our

6   correction.

7            Both parties agree that there is an asset missing from

8   defendant's net worth in Paragraph 75.  It is a $120 million

9   account at New Private Bank.

10            However, after our papers were filed, we learned the

11   defendant did timely disclose the account to Probation, prior

12   to the writing of the PSR.  So, the fact that it is not in the

13   PSR should not be attributed to the defendant.

14            THE COURT:  Okay.

15            Anything else of a --

16            MR. SCANDAGLIA:  No, your Honor.

17            THE COURT:  All right.

18            Then what we also have is a Guideline calculation.

19   And those numbers are the Offense Level is Level 23; a Criminal

20   History Category of I; and, the Guidelines supply a range of 46

21   to 57 months, in terms of incarceration and the other things

22   that go along with that.

23            Are you all in agreement that that is the correct

24   calculation?

25            MS. PETERSEN:  Yes, your Honor.

1          MR. SCANDAGLIA:  Yes, your Honor.

2          THE COURT:  All right.

3          In addition to -- are you in agreement with that?

4          MR. SCANDAGLIA:  Yes, your Honor.

5          THE COURT:  I have, also, the government's sentencing

6     memorandum, I have the defendant's sentencing memorandum; and,

7     I was, also, along with the Presentence Report, favored with

8     approximately 70 letters written, essentially, on behalf of

9     Mr. Warner, which I have reviewed all of that material.

10          Is there anything I am missing in the mix of

11    materials?

12          MS. PETERSEN:  No, your Honor, except I believe the

13    defendant did file a supplemental sentencing memorandum.

14          THE COURT:  He did, but I think that had some

15    additional character letters.

16          And there is an appendix to his submission with

17    authorities for me to look at, which I have seen and have in my

18    possession.

19          Anything beyond that?

20          MS. PETERSEN:  No, your Honor.

21          MR. SCANDAGLIA:  No, your Honor.

22          THE COURT:  All right.  Very well.

23          Then we will proceed with sentencing in the normal

24    way.  I will first hear from the government.

25          And the defense and Mr. Warner can be seated, if you

1   would like.

2          MS. PETERSEN:  Thank you, your Honor.

3          Your Honor, the defendant engaged in a course of

4   conduct to evade taxes for more than a decade.  He filed a

5   total of 16 false tax returns, omitting $24 million worth of

6   income from his Swiss bank accounts.  On each return, he also

7   falsely denied that he had a foreign bank account.

8          The defendant's conduct cost the Treasury over $5

9   million.  His actions constitute a serious offense and one that

10  merits a sentence that includes a term of incarceration.

11         Your Honor, I would like to begin by highlighting

12  defendant's conduct during his tax evasion scheme.

13         The scheme began in January, 1996.  The defendant flew

14  to Zurich and opened an account at UBS.

15         When he opened the account, he signed what is called a

16  Hold Mail Form.  That form instructed UBS not to send him any

17  mail in the United States; not to send him account statements;

18  and, to destroy any documents in his file once they became

19  five years old, including correspondence.

20         From that very first day, the defendant was taking

21  steps to conceal the account from the United States.

22         Now, at this time the defendant already had a

23  successful business, Ty Inc.; and, despite having a highly-

24  qualified, fully-competent set of financial advisors and

25  accountants working for and with his company, handling his

1  personal and business finances, he did not consult any of them

2  about the opening of the account.  And once the account was

3  opened, he didn't tell any of them about it.

4          Why would you hide this account from your trusted

5  advisors?

6          The defendant has not disclosed to the Court the

7  reason he opened an account in Switzerland.  Why not?

8  Something motivated him to open this account at UBS and to hide

9  it from the government.

10         The defendant claims to be fully open and remorseful.

11 However, he has never provided an explanation for why he opened

12 this account.

13         Of course, it is the defendant's right not to offer an

14 explanation.  However, the failure to adequately explain his

15 actions speaks to a lack of candor and remorse.

16         Additionally, the defendant has not explained to the

17 Court where the funds came from to open the account.  The

18 defendant admits that by 2002, the UBS account had over $96

19 million in it.

20         Those funds had to come from somewhere, but the

21 defendant has never identified where.

22         The books and records of Ty Inc. show that those funds

23 were not -- did not come from his company.  They were not wired

24 from Ty Inc.'s accounts.

25         There was no evidence they came from Warner's -- the

 1    funds came from Warner's -- personal domestic accounts, either.

 2            Where did these funds come from?

 3            The evidence suggests that the funds in the account

 4    may have been pre-tax payments of some sort made to the

 5    defendant.

 6            Obviously, if approximately $96 million ends up in a

 7    Swiss bank account and those funds had not been taxed, then

 8    Warner's amount of tax evasion would be significantly higher --

 9    significantly higher -- than the $5 million that is in the plea

10    agreement.

11            Because the defendant has not come clean about the

12    source of the funds, his extent of the tax evasion -- the

13    extent of his tax evasion -- scheme is still unknown.

14            Once the account was opened at UBS, the defendant

15    signed and filed individual tax returns each year:  '96, '97,

16    '98, '99, 2000, 2001.  Each year, each of those returns, he

17    falsely stated he did not have a foreign bank account.

18            And, additionally, each year he did not report any of

19    the income from the account, despite the fact that in many of

20    those years the account was earning more than a million dollars

21    each year.

22            Now, during this time period the defendant had capable

23    CPAs preparing his returns.  However, he prevented them from

24    properly doing their job by hiding the UBS account from them.

25            In late 2002, the defendant moved his account from UBS

1   to a different Swiss bank, Zurcher Kantonalbank.

2              Why would he do that?

3              There are at least two reasons.  First, in 2001, UBS

4   signed an agreement with the IRS, and that agreement said that

5   UBS would withhold taxes and do tax reporting on certain

6   accounts.

7              Secondly, in the early 2000s, UBS acquired a U.S.

8   stock brokerage called Paine Webber.  After the acquisition,

9   UBS now had a U.S. presence and would be subject to process in

10  the United States, including service of a subpoena.

11             In contrast, Zurcher Kantonalbank was a small Swiss-

12  only bank, with no offices in the United States.  It was a

13  perfect place to further conceal money.

14             The defendant directed that his account at UBS be

15  closed and moved to Zurcher Kantonalbank.

16             If the Court would turn to Exhibit D in the

17  government's sentencing papers, the Court will see a letter

18  sent to the bank which, essentially, threatens the bank not to

19  disclose or discuss the UBS account with anyone.

20             The letter instructs UBS not to call, not to visit and

21  not to engage in any communications about the account.

22             And the letter goes on to say, "Non-Compliance will

23  have consequences."

24             The defendant's instructions to the bank in this

25  letter were confirmed during an in-person meeting between the

1    defendant and UBS bankers.

2            And that is notated at the bottom of Exhibit D.

3            When defendant moved the account to Zurcher

4    Kantonalbank, did he declare it?

5            Did he start putting it on his tax returns?

6            He did not, despite the fact that it would be the

7    perfect time to start declaring it:  New bank, fresh start.

8            Instead, the defendant took steps to conceal the

9    account further.  When the account moved to Zurcher

10   Kantonalbank, the defendant puts it in the name of a purported

11   Lichtenstein nominee foundation called the Molani Foundation.

12           Once the account is in the name of the Molani

13   Foundation, the defendant's name appears nowhere on the bank

14   accounts.

15           The defendant's actions further concealed this account

16   from the United States government.

17           After the account is moved to Zurcher Kantonalbank,

18   the defendant continues to file false tax returns for tax years

19   2002, '3, '4, '5, '6 and '7.  Each year, he is still failing to

20   disclose the existence of the account and he is failing to

21   disclose any income from the account.

22           In December of 2007, the defendant amends some of his

23   prior tax returns:  The years 2002 through 2005.  And even

24   though when he amends the returns he makes some corrections to

25   his prior submissions, on those amended returns he still

1  conceals, hides and fails to report the Swiss bank account.

2         The amended returns would have been another perfect

3  time for the defendant to come clean, but he did not do so.

4  Instead, he files four more false tax returns.

5         At this point, his accountants were still in the dark

6  about the secret account.  He has not explained why he has kept

7  it from his tax counsel all of those years.

8         By the end of 2007, the defendant had failed to report

9  over $24 million in income earned at the accounts at UBS and

10 Zurcher Kantonalbank.

11        In September of 2009, the defendant made an inquiry to

12 the government about the government's Voluntary Disclosure

13 Program.  However, his attempts to enter the Voluntary

14 Disclosure Program came too late.  The government had already

15 learned that he had had an undeclared account at UBS and he was

16 already under investigation.

17        Because he was under investigation, he was not

18 eligible for the program.  The timing of the defendant's

19 attempted disclosure is important as it shows the defendant did

20 not even attempt to come forward until it was a near certainty

21 that United States law enforcement was going to discover his

22 account.

23        I would like to back up just a little bit.

24        In 2008, the Department of Justice began an

25 investigation of UBS, and that investigation was related to

1  UBS's assisting their U.S. customers in evading taxes.  And

2  this investigation was well publicized.  It was in all the

3  major newspapers.  However, the defendant did not come forward

4  once UBS was under investigation.

5          In May of 2008, a UBS banker, Bradley Birkenfeld, was

6  indicted for assisting a U.S. customer with evading taxes,

7  using an undeclared UBS account.

8          Again, this was also a very well-publicized event, but

9  the defendant did not come forward in May of 2008.

10         Jump to 2009.  In early 2009, UBS signs a deferred

11 prosecution agreement.  They admit that they helped U.S.

12 customers evade taxes.

13         Does the defendant come forward in early 2009?  He

14 does not.

15         In July of 2009, fellow toy manufacturer Jeffrey

16 Chernick pled guilty to hiding funds in a UBS account.  And not

17 only was Jeffrey Chernick a toy manufacturer, like the

18 defendant, but they shared the same UBS banker and investment

19 advisor, a man named Hansruedi Schumacher.

20         Chernick's plea was well publicized, but defendant

21 still did not come forward.

22         Finally, in August of 2009, Hansruedi Schumacher,

23 himself, was indicted for conspiracy to defraud the United

24 States.  Schumacher was the defendant's banker at UBS; and,

25 when the account moved, he functioned as defendant's

1    independent asset manager.

2         And Schumacher's indictment, like all of the other

3    events I just described, was well publicized.

4         A month later, the defendant finally belatedly

5    attempted to enter the Voluntary Disclosure Program.  And in

6    defendant's sentencing memorandum, he admits that when he

7    entered the Voluntary Disclosure Program -- or tried to enter

8    the Voluntary Disclosure Program -- he knew Schumacher had been

9    indicted.  He didn't try to come in and tell.  He knew that.

10        At that point, the defendant knew that the discovery

11   of his account was inevitable and that it may be imminent.

12        It is clear from this timeline that the defendant's

13   attempts to disclose were not done out of an overwhelming sense

14   of wanting to get right with his tax obligation.  They were

15   only done because he was trying to outrun law enforcement.

16        The defendant's actions were a little more -- little

17   more -- than an attempt to manipulate the Voluntary Disclosure

18   Program.  He waited as long as he possibly could, until it was

19   absolutely clear his account was going to be found out, and

20   that is when he came clean -- or tried to come clean.

21        Further evidence that the defendant's scheme was going

22   to continue until he was reasonably sure he was about to be

23   caught is the complaint that he makes in his sentencing

24   memorandum.  The defendant complains that UBS didn't give him

25   notice that his account was going to be turned over; and, if

1  they had given him notice, he would have come in sooner.

2          What the defendant is essentially telling the Court is

3  that he was going to continue hiding that account until it was

4  crystal clear that he was likely to be found out.

5          The defendant asserts that he is similarly situated to

6  all of these people who entered the Voluntary Disclosure

7  Program and completed it.  But he is mistaken.  And he is

8  mistaken because of the requirements of the program,

9  themselves.

10          In order to successfully complete the Voluntary

11  Disclosure Program, a taxpayer must provide certain information

12  to the United States.  That includes, first of all, they must

13  identify why they opened the foreign bank account.

14          The defendant has not done that.

15          Secondly, they must identify the source of the funds

16  in their offshore bank account.

17          The defendant has not done that, either.

18          THE COURT:  Is not disclosing it sort of a

19  self-evident proposition?

20          (Brief pause.)

21          MS. PETERSEN:  I am sorry, your Honor?

22          THE COURT:  Why would you set up an account and not

23  disclose it unless you are trying to hide your income and not

24  pay tax on it?  Is that not manifest, that it is keeping more

25  money in your pocket than sharing it with the government?

1             MS. PETERSEN:  Yes.

2             I mean, there is nothing illegal about opening a

3     foreign bank account.  A number of people have foreign bank

4     accounts and properly report it.

5             However, in this case, we don't know why the defendant

6     decided to travel to Switzerland and open this account.  It

7     could be simply he wanted to hide the money or it could be

8     those funds were from a source he didn't want the government to

9     know about.  We just don't know.

10            The third piece of information a taxpayer must provide

11    to successfully complete the Voluntary Disclosure Program is

12    that the taxpayer must detail the names of all foreign bankers

13    and asset managers that taxpayer met with, including where,

14    when and what topics were discussed.

15            The defendant has not provided that information,

16    either, despite having an opportunity and incentive to do so

17    over the past year.

18            And just so the Court is aware, the information

19    gathered from these individuals in the Voluntary Disclosure

20    Program has been invaluable to the United States government.

21    It has allowed them to build investigations of offshore banks,

22    bankers and financial institutions, including leading to an

23    indictment of a Swiss bank, Wegelin, and the indictments of

24    over 14 foreign bankers and asset managers.

25            Your Honor, a term of incarceration is just punishment

1  for this offense.  The defendant argues for a term of

2  probation, but he offers no mitigating circumstances sufficient

3  to justify such a sentence.

4      To the extent the defendant is willing to perform

5  community service, such acts would be appropriate during a term

6  of supervised release to follow incarceration.

7      The defendant points out to the Court that he has paid

8  a large penalty and that such a penalty should be punishment

9  enough.

10     And, to be clear, the defendant has paid a $53 million

11  penalty for failing to file an FR Form.  That was separate and

12  apart from any failure he had on his 1040.  It is a separate

13  form that must be filed with the Department of Treasury.

14     The penalty defendant paid is far less than the

15  statutory maximum penalty that the Department of Treasury could

16  have sought.  And, additionally, such a penalty is less than

17  three percent of defendant's overall net worth.

18     It is not materialized -- materially penalizing to the

19  defendant, the amount of this penalty.

20     Additionally, last week the defendant finally filed

21  amended tax returns for 1999 through 2008.  And he reported on

22  those returns the income he earned from the Swiss bank

23  accounts.

24     The defendant paid the additional tax due and owing,

25  which was approximately $14 million.  And, accordingly, the

1    defendant will not -- or the government will not -- be seeking

2    a restitution order, because the defendant has paid -- now paid

3    -- the back tax due and owing.

4         This $14 million payment that the defendant made was

5    simply him paying what he owed all along.

6         The defendant also points out in his sentencing papers

7    he paid an additional $13 million in interest.  However, this

8    sum is directly attributable to his failure to pay the taxes on

9    time in the first place.

10        Your Honor, a tax evasion scheme is often a financial

11   gamble taken by a taxpayer after a cost benefit analysis:  "The

12   government is unlikely to catch me; but, if they do, what are

13   the consequences going to be?"

14        The consequences simply cannot be to just pay what you

15   owe, along with penalties and interest.  For that to be a

16   sufficient consequence turns tax evasion into little more than

17   a bad investment, and it does not offer similarly-situated

18   individuals an incentive not to engage in that conduct.

19        The perception cannot be that a wealthy felon can

20   merely write a check and face no further punishment.

21        The defendant outlines his charitable contributions in

22   his sentencing memorandum.  And there is no dispute that he has

23   certainly helped people along the way, as he became a self-made

24   billionaire.  However, the defendant's good acts do not change

25   the fact that he simply did not pay his fair share of taxes.

1          He paid a significant amount of taxes, but he did not

2   pay what he owed.  And, for that wilful crime, the defendant

3   must face a consequence:  A term of incarceration.

4          An additional factor weighs in favor of incarceration;

5   and, that is, deterrence.  In the coming months, the American

6   taxpayers will fill out their 2013 tax returns.  And as the

7   Court is well-aware, our tax system is a voluntary one.  It

8   relies on taxpayers to accurately report their income and their

9   expenses, so that the IRS can accurately and fairly collect tax

10  revenue.

11         If there are no consequences to actions like the

12  defendant's, taxpayers will begin to lose confidence in the

13  system.  They will have every incentive to fudge the numbers

14  and take a gamble if they think that there is little

15  consequence, other than simply repaying what they owe, if they

16  are caught.

17         That cannot be the message that is sent to taxpayers.

18         And I think more specifically in this case, a number

19  of United States taxpayers continue to hold offshore,

20  undisclosed accounts in Switzerland and in countries all over

21  the world.  Those holding accounts should not be emboldened to

22  continue to hide, because they perceive that there is going to

23  be little consequence if their account is discovered.

24         The need for deterrence also weighs and factors in

25  favor of incarceration.

1   Finally, we turn to the issue of similarly-situated

2 defendants, which is a topic that both the government and

3 defendant spent a significant amount of time on in their

4 sentencing papers.

5   We will start with the Guidelines.  Both the Supreme

6 Court and the Seventh Circuit counsel that the Guidelines are

7 the touchstone and it is where the analysis should begin.

8   And there is no dispute in this case that the

9 Guidelines' range is properly calculated at 46 to 57 months'

10 imprisonment.

11   Further, the Seventh Circuit counsels that one of the

12 best ways to avoid unwarranted sentencing disparities is to

13 give a within-Guideline sentence, because the Guidelines were

14 promulgated to treat similarly-situated offenders similarly.

15   In the defendant's sentencing papers, he describes a

16 number of defendants who got probation.  And he describes them

17 as being similarly-situated to himself.  However, this is a

18 mischaracterization.  Each of the cases cited in the

19 defendant's sentencing memorandum had either no tax loss or a

20 significantly less tax loss than the defendant's case.

21   And, also -- and equally importantly -- in many of

22 the cases cited by the defendant, those defendants provided

23 substantial cooperation to the United States.  They gave

24 information about their bank and their bankers and their asset

25 managers.  And they received reductions in sentences under

1    5K1.1.

2           And Footnote 25 in our memo gives more detail about

3    those defendants and how much reduction they got.

4           Those defendants are simply not similarly-situated to

5    Warner.  They cooperated.  Mr. Warner did not.  And any

6    sentencing disparity between Mr. Warner and those defendants

7    would be a warranted disparity.

8           In the government's sentencing memorandum at Pages 36

9    and 37, the government has highlighted some of the sentences

10   for defendants who are more similarly-situated to Warner;

11   though, again, all of these defendants' tax loss is still

12   significantly less than Warner's tax loss.

13          These defendants received terms of incarceration.

14   Many of them, a year and a day.

15          One example is Peter Troost, who, to the government's

16   knowledge, is the only former UBS client who has been

17   prosecuted in this District.

18          He received a term of incarceration for a year and a

19   day, even though his tax loss was approximately one-fifth the

20   amount of Warner's.

21          Additionally discussed in our sentencing memo are two

22   other defendants, both in the Southern District of New York,

23   who received terms of incarceration of a year and a day, even

24   though their tax loss was between -- or was less than $550,000

25   each.

 1          Based on the facts and circumstances in this case,

 2    probation is not an appropriate sentence.  A period of

 3    incarceration is.

 4          The floor for a term of incarceration given by the

 5    Court should be a year and a day, keeping in mind that other

 6    somewhat similarly-situated defendants who received a year and

 7    a day had much less tax loss than Mr. Warner; and, therefore,

 8    their conduct was less egregious.

 9          Therefore, the government would request a term of

10    incarceration in excess of a year and a day.  Such a sentence

11    is just punishment, given the seriousness of the offense; the

12    decade-plus of tax evasion; the defendant's repetitive lies;

13    his lack of candor; the need for deterrence; and, the sentence

14    of some similarly-situated defendants, albeit with a lesser tax

15    loss.  And all of these factors call for a term of

16    incarceration.

17          Thank you.

18          THE COURT:  Thank you.

19          MR. SCANDAGLIA:  Thank you, your Honor, for this

20    opportunity to address the Court.

21          THE COURT:  Mr. Warner, if you would like, you may be

22    seated while your attorney speaks.  But if you would like, you

23    may stand next to him, as you wish.

24          THE DEFENDANT:  What would you like?

25          MR. SCANDAGLIA:  You might as well sit.

1          Thank you, your Honor, for this opportunity to address

2     the Court on this very important matter.

3          I would like to begin where we left off in October

4     when the Court accepted Mr. Warner's guilty plea.

5          Mr. Warner accepts full responsibility for his

6     criminal conduct.  He knows that what he did was wrong and he

7     knows that there is no excuse for it.  He blames nobody but

8     himself for the situation he finds himself in today.

9          Your Honor, since October we have worked with the U.S.

10    Attorney's office and with the Department of Probation to

11    prepare this case for sentencing, so that there would not be

12    any disagreements or issues requiring the Court's intervention.

13         I would like to thank the U.S. Attorney's office and

14    the Department of Probation for their cooperation and

15    responsiveness during this difficult process.

16         Your Honor, we have reached agreement with the

17    government on many fronts.  We have no disagreement about the

18    Advisory Guideline calculation.

19         And there is no agreement in the case about the

20    penalty and the back taxes Mr. Warner has already paid, which

21    is in excess of $80 million.

22         In fact, Mr. Warner comes before the Court today

23    having already completely fulfilled and satisfied the terms of

24    his plea agreement.

25         As the government noted, he has filed his amended

1   returns back to 1999; he has paid all tax and interest called

2   for by those amended returns; he has paid a penalty of over $53

3   million for his failure to file the FBAR form; he has provided

4   all requested information to U.S. Probation; and, as the

5   government has already pointed out, there is no need for an

6   order of restitution today because of the substantial payments

7   he has already made.

8          The only remaining issue in this case for the Court to

9   decide, your Honor, is to fashion a sentence that is

10  sufficient, but not greater than necessary, to comply with the

11  purposes of sentencing.

12         Given the criminal guilty plea entered and accepted

13  by the Court, the restitution and the fines he has already

14  paid, the sentencing question for the Court will boil down, I

15  think, to whether the Court accepts the government's position

16  that the only just sentence here is a period of incarceration,

17  or the defense position that a period of probation and

18  significant community service, in addition to the sanctions and

19  penalties he has already paid, is sufficient to address the

20  aims of sentencing.

21         Your Honor, I respectfully submit that in this case

22  incarceration is not necessary to accomplish the goals of

23  sentencing.  The government has acknowledged in their

24  sentencing memorandum that Mr. Warner does not present any risk

25  of recidivism.  He will not be before this Court or in this

1    building ever again to face tax or any other kinds of criminal

2    charges, as the government agrees.

3          It is not necessary, your Honor, to take Mr. Warner

4    off the streets, because he does not present a safety risk to

5    anyone.

6          As a matter of fact, as I will discuss at the end of

7    my remarks, a period of incarceration and taking Mr. Warner off

8    the streets will actually cause a societal harm in that it will

9    take him away from the philanthropy, the charitable works, the

10   time he devotes to good causes and making a difference in

11   people's lives, including the specific proposals that have been

12   attached to our sentencing memorandum.

13         Likewise, your Honor, the goal of retribution, I

14   submit, has already been satisfied in this case.  It has been

15   satisfied by Mr. Warner's very public guilty plea in this case

16   to felony criminal activity; by his complete and total

17   acceptance of criminal responsibility; and, by the payment of

18   fines that have already been imposed.

19         In fact, the FBAR penalty paid by Mr. Warner, I

20   believe, is the largest of its kind in the history of tax

21   enforcement.

22         Your Honor, for these reasons, the goal of sentencing

23   in this case would be well-served by adding a sentence of

24   probation, with meaningful community service, to the sanctions

25   and punishments already imposed on Mr. Warner.

1      This outcome would not only fulfill the purpose of

2 sentencing in this particular case, but it would also be

3 consistent with the overwhelming majority of sentences handed

4 down in federal courts nationwide for this very same conduct.

5      Your Honor, the statistics on this are overwhelming.

6 There have been approximately 40,000 American citizens who have

7 come forward to disclose their overseas bank accounts, to try

8 to come clean and make a clean breast with the government.

9      I think the number now is about 43,000.

10      Of those, 99 percent of those American taxpayers who,

11 like Mr. Warner, came forward to the government, disclosed

12 their accounts and offered cooperation.

13      I am going to return to that point in a second.

14      99 percent of those people have not faced criminal

15 prosecution of any kind.  Never mind the prospect of

16 incarceration, they have not been criminally prosecuted at all.

17      And, your Honor, I am going to come back to this, but

18 the point was repeatedly made by the government that, you know,

19 one of Mr. Warner's failings here -- one of the aggravating

20 circumstances for you to take into account -- was his failure

21 to cooperate.  And that allowed the government to separate him

22 out from the pack and insist that incarceration is the proper

23 outcome.

24      I am amazed by that remark from the government because

25 when Mr. Warner made his application to get into the Voluntary

1  Disclosure Program, it was coupled with an offer of

2  cooperation.

3          Mr. Warner stood ready to come in, volunteer the

4  existence of his account, provide all of the information he

5  ultimately provided to them, and cooperate in any way that

6  could have assisted the government.  And that offer was

7  rebuffed.

8          So, to come into court today and try to exacerbate his

9  punishment because he failed to cooperate, when the door was

10 closed in his face when he was offering cooperation, I think is

11 unreasonable.

12         So, your Honor, 99 percent of the 40-plus thousand

13 people who came forward, like Mr. Warner, to disclose their

14 accounts, faced no criminal prosecution of any kind.

15         Of the hundred -- and that is all there is -- of the

16 hundred that were prosecuted, the vast majority of those, your

17 Honor -- over 60 percent of those -- received no incarceration.

18         So, a period of probation, with meaningful community

19 service, will not only satisfy the aims of sentencing, but will

20 also be very much consistent with the sentences that have been

21 handed down nationwide for this exact same conduct.

22         Your Honor, you have heard about, both in the papers

23 and in argument, the special IRS program which was designed

24 specifically to deal we undisclosed overseas bank accounts.  As

25 you know, it is called the Overseas Voluntary Disclosure

1    Program.

2           In 2009, the first Overseas Voluntary Disclosure

3    Program was implemented by the IRS and was widely publicized by

4    the government, including the Commissioner of the IRS, as an

5    open invitation for American citizens who held overseas

6    accounts to come forward and bring their accounts back into the

7    U.S. tax system and get back into full tax compliance.

8           Your Honor, that was the officially-stated purpose of

9    the Voluntary Disclosure Program.  It recognized -- it was

10   based on the idea that there are many American citizens with

11   overseas accounts; and, as a result of those overseas accounts,

12   are in violation of U.S. tax laws -- criminal tax laws.

13          The government designed this program to open the doors

14   wide so that American citizens, who chose to come forward,

15   could turn themselves in and, in exchange for turning

16   themselves in, would face only civil disposition of their tax

17   circumstances.

18          No indictments, no criminal informations, no guilty

19   pleas, no criminal penalties; but, instead, quiet, private and

20   anonymous civil review and resolution of their tax

21   responsibilities.

22          That was the purpose of the government's program.  It

23   was advertised that way.  The Web site described it that way.

24   And the Commissioner at the time of the IRS, Mr. Shulman, was

25   quoted widely advising -- affirmatively advising -- American

1   citizens, "If you have an overseas account and you are

2   wondering what to do, come into the IRS.  Turn yourself in.

3   You will avoid criminal prosecution."

4          Now, in creating this program, your Honor, the

5   government attached really one condition.  The one condition

6   was:  "If we already have your name, then you are not eligible

7   for the program."  That was the one condition.

8          And, in fact, as I will get to, when Mr. Warner turned

9   himself in, in the fall of 2009, he was rejected because the

10  government said they already had his name.

11         That is the eligibility requirement.  And the reason

12  why that is important, your Honor, is when they developed this

13  program, it was from scratch.  And the goal of the program --

14  the policy initiative -- was to bring people into

15  tax compliance.  All right?  It was not to send them to jail.

16  It was a civil process of getting back into tax compliance.

17         If it were the case, your Honor, that the government

18  wanted to prosecute and send to jail all American citizens --

19  send to prison all American citizens -- with overseas bank

20  accounts or make decisions about who is entitled to civil or

21  will get civil enforcement, who will get criminal enforcement,

22  they had the opportunity to do it.

23         They could have created the program and said, "If you

24  are wealthy and you have the money and you could have paid the

25  taxes at the time, don't apply to the program.  You are not

1  getting in.  There is going to be criminal treatment for you

2  because you're wealthy and because you could have paid the

3  taxes at the time."

4           If there was a legitimate purpose pursued by the

5  government, where they said, "If your account is of a certain

6  size, of a certain magnitude, you can't get civil enforcement.

7  You have to be prosecuted criminally," they could have put that

8  in the program.

9           They could have said, "If your account is more than

10  $50 million, you are not welcome in."

11          Likewise, if the important distinguishing factor

12  between criminal prosecution and a civil, quiet resolution is

13  how many years you held the account, that could have been

14  incorporated in the program.

15          They could have said, "If there has been more than

16  five successive tax returns that don't identify your overseas

17  account, that is a criminal resolution.  You are not invited

18  into the civil program."

19          But they didn't do that, Judge.  They attached one

20  condition:  "If we have your name, then no civil resolution.

21  You will face criminal prosecution."

22          And that is what happened to Mr. Warner.

23          And we don't know anything really about how they got

24  his name, where the name came from.  Some unidentified

25  anonymous cooperator or source apparently passed his name along

1    to the government; and, for that reason, Mr. Warner had to

2    plead guilty and now faces the prospect of potential

3    incarceration.

4         Now, this is important, your Honor.  I am not asking

5    the Court and I am not asking the government to revisit their

6    decision of rejecting Mr. Warner when he applied for the

7    program, turned himself in and offered to cooperate in any way

8    in their ongoing investigation of the Swiss bankers.  I am not

9    asking anybody to revisit that.  That is water under the

10   bridge.

11        They are permitted to devise programs as they see fit

12   and attach the conditions that they think are important.

13        Having said that, your Honor, this program is still

14   directly relevant to the Court's decision today and to the

15   subject of sentencing here for two reasons.

16        First, although it is dismissed by the government

17   casually, Mr. Warner's attempt to get into the program is a

18   very, very significant piece of evidence about Mr. Warner --

19   about the history and characteristic of this offense and of

20   this defendant.

21        In 2009, the IRS implemented its first Overseas

22   Disclosure Program.  Mr. Warner made his application in timely

23   fashion to that first program and it was rejected.  He did so

24   to disclose his account, pay back taxes and penalties and put

25   this behind him.

1          Now, the government told you that, "Oh, he waited
2     until the last minute.  And, so, he should not get any credit
3     for doing this because he waited until the last minute."
4          Your Honor, there is a second and a third Voluntary
5     Disclosure Program that followed the program that Mr. Warner
6     tried to get into.  Tens of thousands of people who had
7     accounts overseas, some accounts bigger than Mr. Warner's, some
8     conduct worse, some conduct exactly the same, they waited much
9     later than Mr. Warner.
10         The doors are still open.  People are going into that
11    program today.
12         Mr. Warner attempted to get into that first program.
13         As a matter of fact, not only have there been
14    successive disclosure programs for taxpayers, but now the
15    government has announced that there is even going to be a
16    disclosure program for the Swiss banks.
17         So, the bankers and the banks, who are the architects
18    of Swiss tax bank secrecy, some of whom sent bankers here to
19    lure wealthy individuals into opening safekeeping accounts by
20    going to places where they hoped they could find wealthy
21    individuals and ask them if they would be interested in
22    safeguarding some of their assets, these banks are now invited
23    into the government to receive protection and no criminal
24    enforcement.
25         So, Mr. Warner's attempt to get into this program --

1  in the first program -- to offer his cooperation to the

2  government and to come clean on his taxes and make amends, is

3  relevant, in terms of the history and characteristics of this

4  defendant and this offense.  And not because I want you to

5  question -- I don't question -- why the government rejected

6  him.  That is their program.  They set the rules.  They can do

7  that.

8          But what they can't do is they can't try to take the

9  moral imperative here and say that Mr. Warner, because some

10 unknown, unidentified person passed his name along, should go

11 to jail, when 43,000-plus -- and counting -- American citizens

12 who came forward, many of them after Mr. Warner, get civil

13 resolution; that somehow, in that circumstance, the only just

14 and fair thing to do is to send Mr. Warner to prison.  That is

15 unreasonable.

16         It is -- with all due respect to the government, it is

17 -- hypocritical.  They can't have it both ways.  They can't say

18 that this conduct is almost a per se incarceration offense for

19 Mr. Warner; but, for everybody else who, for who knows what

20 reason their name didn't pop up, not only no incarceration, no

21 criminal prosecution whatsoever.  No guilty plea.  They can't

22 have it both ways.

23         That program, your Honor, is an insight for the Court

24 about a tax policy as it relates to this subsection of overseas

25 -- undisclosed overseas -- bank accounts.  And what it tells

1   you -- and the government has not been shy about this
2   historically -- is that their goal is to get American citizens
3   back into the tax system; to get those accounts and those taxes
4   back into the U.S. system, and to achieve full compliance -- to
5   invite people back into full compliance.
6          And Mr. Warner, in every respect, responded to that
7   invitation in good faith and turned himself in and disclosed
8   his account and was prepared to provide whatever cooperation
9   the government needed, to put this behind him.
10         And he was rejected, which they are entitled to do.
11  But they are not entitled to say, "Having rejected you, the
12  only fair thing, the only thing consistent with national tax
13  policy on this issue, is for you to go to prison," because that
14  is not how this program has been treated, that is not how this
15  area of tax enforcement is being handled.
16         And, in fact, your Honor, I would submit that this
17  message is impacting federal courts nationwide who are hearing
18  these cases.  Because, as I mentioned, of the hundred, only --
19  of the hundred that have actually gotten to courts as part of
20  their prosecution, the majority of those defendants are
21  receiving probation.  And I think it is because the courts are
22  recognizing that the government can't have it both ways.
23         And, Judge, we are not asking you to reconsider or
24  evaluate or call into question the government's decision about
25  not admitting Mr. Warner into the program, to be clear.  We are

1   just trying to communicate to the Judge the idea that since

2   people whose conduct was exactly like Mr. Warner's, some worse,

3   some better, were entitled to civil treatment and non-public

4   resolution of their tax responsibilities through the program,

5   that does not permit the government today to say that the only

6   just resolution here is a term of imprisonment.

7           In fact, Judge, as it relates to retribution or

8   deterrence, I think a very public felony plea, with a much

9   higher penalty -- the largest FBAR penalty ever -- probation

10  and community service, as in this case, is enough.

11          It is enough to satisfy the goals of sentencing; it is

12  enough to send a message to others who are out there with

13  undeclared accounts, that the only safe course is to come

14  forward, is to disclose the account and take care of any taxes

15  and penalties that are owed.

16          The government says it is not good enough.  And they

17  say it is not good enough only because of this chance and,

18  unbeknownst to Mr. Warner, occurrence -- where they happened to

19  get his name from some unknown, unidentified cooperator -- that

20  is not a legitimate basis to separate out those who get

21  anonymous civil treatment from those who are faced with

22  pleading to a criminal conviction and face the specter of

23  imprisonment.

24          Your Honor, what we have presented to the Court is our

25  attempt to sentence -- to provide the Court with a sentence

1   that will capture the value of Mr. Warner's's long-standing

2   personal commitment to good works.

3          And the government has made the point, both in their

4   papers and during this argument, that, "Oh, yes, you know, he

5   is a wealthy man that has given to charity, and that is great,

6   but it really shouldn't matter to the Court."

7          But what I want to emphasize to the Court, because it

8   relates directly to the specific community service proposals we

9   have made, is that as those letters that were provided to the

10   Court on Mr. Warner's behalf demonstrate, his commitment to

11   community service and good works has not been one of just

12   checkbook charity.  He has identified opportunities where he

13   can devote his time, his expertise, his compassion for others,

14   to help those less fortunate than him.

15          You know, designing a product for the Pediatric AIDS

16   Foundation or, you know, for the sailors on the USS Reagan,

17   this is not simply writing a check.  This is Mr. Warner giving

18   of his time and of his expertise to help others.

19          And that is unique.  And that does separate Mr.

20   Warner, I think, from his peers.  And I think that makes the

21   suggestion of community service, as a condition of probation, a

22   meaningful one here.

23          We have been contacted from a number of organizations

24   who have followed the case in the press, who have asked us to

25   relay to the Court their interest in working with Mr. Warner

1    and getting the benefit of Mr. Warner's time and commitment and

2    compassion, to help their institutions, their schools.

3            In fact, one in particular -- and I think it was part

4    of a supplement that we provided to the Court -- is a Catholic

5    school on the South Side called the Leo school.

6            As a matter of fact, the President of that school,

7    Mr. Dan McGrath, is here in the courtroom today.  And that

8    program, like the program for the Tilden School that we also

9    submitted, is not about writing a check.  It is not about

10   sending money over.  It is about a consistent and ongoing

11   process of Mr. Warner dedicating his time and his expertise to

12   high school students who are facing obstacles, like Mr. Warner

13   faced in his youth, without educational advantages or the

14   financial advantages that a lot of people have.

15           And I am sure you have reviewed the proposal, your

16   Honor, but the proposal is pretty specific about the kinds of

17   ways Mr. Warner can and is willing to make the contribution:

18   To come to the school on a regular basis and work with the

19   Business Club to develop a product -- perhaps a mascot, have it

20   manufactured, have it marketed, with the children's -- with the

21   students' -- involvement, teaching them how that process works,

22   teaching them about business etiquette, how marketing words,

23   the requirements of manufacturing and quality control -- the

24   things that Mr. Warner has developed an expertise in -- and,

25   then, ultimately market and sell the product, with the proceeds

1  going to the school, either for scholarships, for graduating

2  students of the school or to fund incoming students whose

3  families do not have the means to pay for a private education.

4       And these opportunities, your Honor, are serious

5  commitments of time and serious commitments of Mr. Warner,

6  himself.

7       They are not empty gestures.  The proposals and the

8  program we recommend are opportunities for Mr. Warner to give

9  back in a very meaningful way.

10       Mr. Warner has offered -- and it is in the Leo school

11  proposal -- to provide scholarships for certain students to

12  come out to the Ty offices in Westmont, Illinois, and spend

13  time with Mr. Warner hands-on, seeing how business is

14  conducted.

15       This could be invaluable, both in terms of its

16  educational benefit, but also in terms of providing hope and

17  opportunities to students who might not otherwise have such

18  opportunities.

19       And this is very fitting for Mr. Warner because it

20  tracks his own life.  He was not a privileged child.  He

21  doesn't have a financing degree.  He is not a CPA.  He is a

22  self-made person.  And with the support of people around him,

23  he was able to accomplish great things.  And I think it would

24  be a very just part of the menu of punishments he has already

25  to include that opportunity, rather than incarceration, where,

1   frankly, no societal benefit will be derived from that.  That

2   would really be a lost opportunity.

3          Simply put, your Honor, and in closing, a sentence of

4   probation with community service, consistent with what we have

5   described and submitted to the Court, will provide the greatest

6   benefit to society and satisfy the objectives of sentencing.

7          I believe now Mr. Warner would like to address the

8   Court briefly, if you have no further questions of the

9   attorneys.

10          THE COURT:  I do not.

11          THE DEFENDANT:  Thank you for allowing me to speak to

12   you, your Honor.

13          THE COURT:  You have that right, Mr. Warner.

14          THE DEFENDANT:  I will put this (indicating) back on.

15          THE COURT:  I just said, "You have that right."

16          (Laughter.)

17          THE DEFENDANT:  Yes.

18          Thank you.

19          I want to apologize to the Court for the conduct that

20   brought me here today.  I am overwhelmed and humbly thankful

21   for all of the letters of support from so many people.

22          I never expected such understanding, such kindness.  I

23   will be forever grateful to them.

24          Their sheer -- their trust has made my feelings of

25   shame and embarrassment just so much more unbearable.

1    And, unfortunately, I never realized that the biggest

2  mistake I ever made in my life would cost me the respect of

3  those most important to me.

4    So, for all of this, your Honor, I am truly sorry.

5    THE COURT:  Thank you.

6    THE DEFENDANT:  Yes, your Honor.

7    THE COURT:  You may be seated.

8    The first thing I want to do is address the Guidelines

9  and the variety of comparisons made by both sides to other

10  people who have been engaged in conduct at least somewhat

11  similar to Mr. Warner's.

12    For a variety of reasons, which I will articulate more

13  fully, I find Mr. Warner to be a very unique individual.  Not

14  only in terms of the criminality that he has engaged in, which

15  was not insubstantial, but his services and kindness to

16  mankind, all of which was done without a view toward using it

17  at sentencing, as we are in the midst of.

18    When a federal defendant stands before a judge for

19  sentencing, the starting point for analysis is the sentencing

20  statute itself.

21    The statute reflects a number of factors which must be

22  considered.  And the difficulty judges face is that those

23  factors run in different directions.

24    The statute is broad and makes relevant the non-

25  criminal conduct of the defendant, when compared to those acts

1    for which he stands convicted.

2         Additionally, there are some principles extraneous to

3    the acts of the defendant, which are fundamental to any system

4    of criminal justice.

5         The first of these is the dignity of the law and the

6    respect which is its due.

7         The other principal at play is the concept of

8    fairness.  It is important to keep faith in these types of

9    cases, with those citizens who dutifully report their income

10   and pay their taxes when due.

11        Part of the equation includes treatment of the rich

12   and poor similarly and the use of similar concepts in the

13   analysis -- whether or not the criteria produce dissimilar

14   results and outcomes.

15        The advocacy of the parties before me is excellent.  I

16   anticipated that when I read your papers and I find it to be

17   true today.

18        The issues have been strikingly framed.

19        Mr. Warner hid a substantial amount of money from the

20   government for a number of years and failed to report and pay

21   taxes on the income earned from the hidden funds.

22        The defendant has admitted to his crimes, but urges

23   that a more complete picture of his life justifies a more

24   merciful notion of punishment and the opportunity to provide

25   beneficial services to the community.

1    It is not unusual to receive letters on behalf of a

2    defendant prior to sentencing.  These letters are often written

3    by family members or close friends and often have a pro forma

4    quality about them.

5    The letters I received about Ty Warner were, in many

6    respects, quite different.  More often than not, the writers

7    described knowledge and experiences which speak to Mr. Warner's

8    personal qualities, which differ from those he manifested in

9    committing the crimes he has admitted.

10    The letters, numbering somewhere in the neighborhood

11    of 70, many of them were multi-paged.  And I have reviewed all

12    of them.

13    In the interests of a more complete record, helpful to

14    a public understanding of the sentencing process, I will

15    describe some of them to you at this time.

16    One of the letters came from a woman who lives in

17    Santa Barbara, California.  And this is what she wrote.  And in

18    the interests of completeness and context, I am going to read

19    the entirety of her letter.

20    "As a long-time resident of Santa Barbara, California,

21    my professional and personal background is what led me to meet

22    Ty Warner unexpectedly.  After, roughly, 20 years of work in

23    accounting and finance, I changed my career path and went into

24    alternative medicine, to work as a master herbalist.  I have

25    treated patients with traditional Chinese medicine and other

1  forms of herbal medicine for 10 years.  I commonly research

2  treatment options for my patients.

3       "In June, 2011, I suddenly found myself in the

4  hospital Emergency Room with kidney failure from a bacterial

5  infection.  By the end of the year, I was able to begin

6  researching the choices for addressing my health crisis and I

7  focused on the promising field of adult stem cell medicine.

8       "Without my background in alternative medicine, I

9  wouldn't have known what to look for while doing my research.

10  It took time to locate, choose and verify the legitimacy of the

11  clinic out of the county for the procedure I needed.  And the

12  treatment came with a hefty price tag.

13       "I am very fortunate that this is where Ty Warner

14  enters the picture.  During one of my fundraisers in July,

15  2012, called "Parking for Jenny," a man drove up asking for

16  directions.

17       "I was raising money by asking people to donate to

18  park in a local parking lot for a nearby festival.  I gave

19  flyers to every person, to explain my fundraising goals, and

20  gave one to the lost man, never expecting to see him, again.

21       "An hour or so later, he returned.  He had read my

22  flyer.  I did not recognize this man, as he rolled down the

23  window, smiled and reached out his hand.  He introduced himself

24  as Ty Warner and asked how much money I needed to raise.

25       "I still needed $20,000 for my treatment.  Without

1   hesitation, Ty offered to take care of it for me and told me

2   that he'd send me a check for that amount.  I was speechless.

3          "Ty Warner was true to his word.  Due to his heartfelt

4   generosity and the other donations I received, I was able to

5   get my treatment in August, 2012.  The results have been

6   positive.  I went from a boxful of medications to only two.  My

7   dialysis time gradually dropped, so that now I only require

8   half as much time connected to the dialysis machine.

9          "This may not seem like much, but to a dialysis

10  patient, it is a big deal.

11         "Ty's generosity went further than simply donating.

12  He provided the network to get my story out there, to help

13  raise awareness about the possibilities of adult stem cell

14  medicine for kidney failure.  Ty connected me with people to

15  set up a public Facebook page and he encouraged me to keep

16  sharing about my experience via my blog.

17         "In a year's time, I have been invited to meet with

18  leaders in the field of stem cell medicine.  I have toured

19  labs, altered the path of research and helped others learn

20  about stem cell treatments.  Ty's philanthropic actions have

21  not only changed my life, they trickled down to change the

22  lives of countless others.

23         "The research and treatment in adult stem cell

24  medicine are advancing exponentially.  A month ago, I had my

25  second treatment and it was in the USA this time.  I expect

1   great things and will be eternally grateful for meeting Ty

2   Warner.  I know Ty Warner as a kind, helpful, sincere man with

3   a great deal of integrity.  He didn't have to return after

4   reading my flyer.  He chose to do so."

5           Another letter came from Las Vegas, Nevada, and this

6   one involves the great tennis player Andre Agassi, about whom I

7   had read previously, and the magnificent work he is doing in

8   Las Vegas for inner city children and others in need.  And here

9   is the letter I got about that Foundation.

10          "Dear Honorable Kocoras:  The Andre Agassi Foundation

11  for Education built and opened a public charter school, Andre

12  Agassi College Preparatory Academy, which predominately serves

13  at-risk youth in Las Vegas.

14          "In 2003, in honor of a very generous gift of $6.3

15  million from Mr. Ty Warner, the Agassi Foundation renamed one

16  of our buildings the 'Ty Warner Middle School Building.'

17          "Mr. Warner's gift remains in the top ten most

18  generous gifts the Foundation has received to date.

19          "Agassi Prep continues to thrive in what is known as

20  one of the most economically-deprived areas of Las Vegas.  We

21  are thankful we are able to provide a quality education to our

22  students through the generosity of donors, such as Mr. Warner."

23          And it is signed by both the Chief Executive Officer

24  and the Chief Operating Officer.

25          Another letter came from Mr. Warner's real estate

1  lawyer and concerned a park located in Westmont, Illinois.  And

2  I will spare you most of the letter, but I will read a relevant

3  paragraph.

4        "I also represented Ty in all of his work with the

5  Westmont Park District.

6        "In the late 1990s, the Westmont Park District became

7  interested in acquiring 36 acres of vacant land centrally

8  located in Westmont.  The land was totally unimproved, used by

9  people illegally for dumping, et cetera, and the Park District

10  was very desirous of developing the land as a public park.

11  They were willing to undertake an eminent domain proceeding to

12  acquire the land, but simply did not have the money to complete

13  the acquisition and then develop the park.

14        "When Ty discovered this, he stepped in and agreed to

15  donate all of the additional necessary money and, indeed,

16  agreed to fund the operation and maintenance of the park for a

17  number of years.

18        "The land was acquired by the Park District,

19  beautifully improved with plants created by the Ty's

20  architects, and today it stands as a visible legacy of his many

21  charitable works over the years.  I recollect that Ty donated

22  over $13 million to the Park District for the park."

23        There is an organization called the Children's Hunger

24  Fund, and that organization has also been the beneficiary of

25  Mr. Warner's generosity.  This is what the President and

1    Founder had to say about Mr. Warner.

2         "It is my privilege to write this letter on behalf of

3    Ty Warner.  For the past 21 years, I have served as President

4    and Founder of Children's Hunger Fund, an Evangelical

5    international children's organization committed to serving the

6    needs of suffering children across America and around the

7    world.

8         "In 2000, we struck up a relationship with Ty Inc.,

9    located in Westmont, Illinois, where Mr. Warner was presented

10   with the opportunity to assist us in our efforts to supply

11   children in need with toys for the holiday season that year.

12        "Since that first conversation, the generosity of Mr.

13   Warner has been nothing short of amazing.  Over the last

14   13 years, Mr. Warner and Ty Inc. have donated to Children's

15   Hunger Fund $11,287,720 plush toys valued at $70,880,832.74.

16   These toys included teddy bears, Beanie Babies and a variety of

17   assorted animal plush toys and dolls, that have been

18   distributed to the children in need all over the world.

19   Children in orphanages, cancer treatment facilities, hospitals,

20   slums and villages, inner cities, poor rural area and

21   disaster-stricken areas have been the recipient of Mr. Warner's

22   generosity and compassion."

23        And it lists a whole variety of other endeavors and

24   projects and philanthropies.  And I will not read the rest of

25   it.  But at the conclusion of the letter, here is what the

1   President and Founder of that organization had to say.

2          "Mr. Warner's personal generosity is unprecedented in

3   my personal experience of more than 30 years of leadership in

4   the non-profit sector.  While we have offered numerous times in

5   the course of our relationship to publicize or promote

6   Mr. Warner's generosity to CHF, in every instance he has humbly

7   requested that no special efforts be made to publicly

8   acknowledge his philanthropy.  He is an individual that has

9   given back immeasurably to those who are disadvantaged or in

10  need of assistance, and someone who we are extremely grateful

11  to have as one of our key supporters."

12         Another letter came from Mr. Warner's long-standing

13  intellectual property lawyer.  And this is what he wrote, in

14  part.

15         "Mr. Warner's pursuit of excellence in his work is

16  relentless.  For example, of many that I observed over the

17  years, occurred in the summer of 1997 when I accompanied Ty to

18  Hong Kong on business.

19         "Princess Diana of Wales had recently died in a tragic

20  accident and Ty was designing a plush toy in her honor.  The

21  iterations of the toy from the factory to Ty and back to the

22  factory seemed endless over a two-day period, until Ty was

23  finally satisfied and approved the production prototype.  He

24  exhibited a tremendous attention to detail and work ethic,

25  traits that served him well in developing his company.

1        "While Ty Warner is single and has no family except

2   for a sister who lives in the State of Washington, his

3   generosity, from my observation, extends well beyond his own

4   employees.

5        "As noted above, Mr. Warner designed a toy in Princess

6   Diana's honor in 1997 and donated the $20 million in profits

7   from that plush toy to the Diana, Princess of Wales Memorial

8   Fund.

9        "I am aware of numerous other charities Ty Warner

10  contributed to, that reach beyond the local community,

11  including the Mayo Clinic Foundation, the Children's Hunger

12  Fund, Toys For Tots, Elizabeth Glaser Pediatric AIDS Foundation

13  and the New York Police and Fire Departments."

14       There are others and I will now read even more.

15       There is another letter that was authored by a

16  Certified Public Accountant who was the Controller/Director of

17  the financial reporting for Mr. Warner's company.  This is what

18  he wrote, in part.

19       "I have worked in several different work environments

20  and meet many people through my business career and children's

21  activities.  As a result, I have met a wide variety of people

22  over the last 32 years.  Ty Warner has been the most benevolent

23  person I have ever met.  When Ty was setting new monthly sales

24  records, Ty was paying quarterly bonuses to all of the

25  employees.

1    "Also, when Ty Inc. broke $1 million in annual sales,

2    Ty paid an annual bonus equal to one year's salary before

3    taxes.  That bonus made all of the employees feel like they had

4    won the lottery and truly changed their lives for several

5    years.

6    "In addition, throughout that high sales period, Ty

7    kept the same commission rate to his sales force; and, as a

8    result, many of them became millionaires in just a couple of

9    years."

10   Isadore Sharp, the Founder of the Four Seasons Hotel

11   and Resorts, lost his 18-year old son to cancer.  Mr. Warner

12   created the Issy Bear in his honor, in memory of his son, and

13   donated $2 million for cancer research from the sales of the

14   Issy Bear."

15   This is another letter in the number I received.

16   The last letter I will particularize came from an

17   account executive at Mr. Warner's company.  In her letter, she

18   described the donation of $2 million in relief for the massive

19   earthquake in tsunami disaster in Japan.

20   The other letters not referenced describe a host of

21   other actions, large and small, which reflect on Mr. Warner and

22   are entitled to consideration in determining a just sentence

23   for him.

24   The record before me reflects the following salient

25   facts:  The defendant had undisclosed Swiss bank accounts that,

1    at their peek, exceeded $100 million.

2              The defendant failed to report the income on those

3    accounts on his federal tax returns.

4              The defendant failed to pay taxes of approximately

5    $5 million on that omitted income in the years 1999 to 2007.

6              The omitted income was a small fraction of his income.

7    The defendant has paid millions of dollars in legitimate income

8    taxes.

9              The defendant applied to the Internal Revenue Service

10   under an amnesty program prior to him knowing his name had been

11   submitted to Internal Revenue Service.

12             He was rejected from the amnesty program.  And you

13   have heard a lot of argument about the pros and cons of that

14   program and his attempts to enter it.

15             The defendant has entered into a plea agreement with

16   the government in which he agreed to pay all of the taxes,

17   penalties and interest due on the omitted income.

18             It is my understanding -- and I think the record

19   reflects -- that all of that has been done.

20             Another feature of the defendant's plea agreement is

21   the payment of a fine of $53 million for failure to disclose

22   the existence of a Swiss bank account.

23             This, too, it is my understanding, has also been done

24   and that has been represented by the attorneys.

25             In sum, the defendant has fully complied with all of

1  the terms of the plea agreement.

2        The hard question in this case is whether or not,

3  given all of the relevant circumstances of the crimes and of

4  the defendant, himself, some period of incarceration should be

5  imposed.

6        One of the considerations has to do with deterrence.

7  It is obvious that specific deterrence is not necessary here.

8  Mr. Warner has satisfied his civil legal obligations fully and

9  there is no question of him violating the tax laws in the

10  future.

11        As for general deterrence of others in committing like

12  crimes, some of that has already been established.  This has

13  been a highly-publicized prosecution.  And the public

14  humiliation and reproachment Mr. Warner has experienced is

15  manifest.  Only he knows the private torment he has suffered by

16  the public condemnation directed at him.

17        As I stated earlier, the sentencing statute and

18  factors described run in different directions.  So, it is left

19  to me to weigh them all and balance them, as best as I am

20  humanly able.  While the crime for which he stands convicted is

21  a serious one, it goes to the essence of how we govern

22  ourselves.

23        Mr. Warner's private acts of kindness, generosity and

24  benevolence are overwhelming.  Never have I had a defendant in

25  any case -- white collar crime or otherwise -- demonstrate the

1    level of humanity and concern for the welfare of others as has

2    Mr. Warner.

3            The letters I described were only a small part of his

4    good works, most done quietly and privately, and motivated by

5    the purest of intentions.

6            One of the considerations for me is whether society

7    would be better off with Mr. Warner in jail or whether it would

8    be best served by utilizing his talents and beneficience to

9    help make this a better world.

10           Casting the question that way has given me guidance as

11   to what a just sentence should be in this case.  And this is

12   what I have decided; and, accordingly, this will be the

13   sentence in the case.

14           Mr. Warner will be placed on probation for a period of

15   two years, with the following conditions:  That he will provide

16   at least 500 hours of community service, among others, to the

17   following schools:  The Ellen Richards Career Academy High

18   School, the Edward Tilden Career Community Academy High School

19   and to Leo High School.

20           That there are other charities and other schools that

21   he and the Probation would consider, that is open.  But that

22   is, at least, the minimum.

23           And the 500 hours is also a minimum.  To the extent

24   that it is prudent to offer more, I will expect that.

25           Another condition of the probation is that he pay a

1    fine of $100,000; that he pay the costs of prosecution in the

2    amount of $500; and, that he pay a special assessment of $100.

3          This has been, for the parties and for me, as well, as

4    most sentencings are, a difficult case.  But, in the end -- in

5    the end -- as you can tell from my remarks, what I found most

6    significant is that, yes, he committed crimes; he hid; he acted

7    in a way a lot of other people acted, who try to cheat the

8    government.  And I spent a lot of hours trying to figure out

9    why people do that.

10         Is it a disenchantment with the government?

11         Is it a desire to not share the spoils of your labors

12   with the government?

13         Is it some other reason?

14         Is it to keep as much as you can?

15         I do not know the motivations; and, frankly, I do not

16   know Mr. Warner's, either.  But it is not that, that triggers

17   whatever a proper sentence will be in this case because in

18   Mr. Warner's case, as I have alluded to quite frequently in

19   this presentation of my own, he did things that I am not aware

20   anyone else does.  Certainly, not anyone before me.  And it

21   would be unjust for me to ignore that, not measure it and not

22   say, in the end, that trumps all of the ill-will and misconduct

23   he engaged in.

24         And really -- and I believe this with all of my

25   heart -- society will be best-served by allowing him to

1    continue his good works.

2            He has paid more than he ever would have paid had he

3    filed the returns and included all of the income.  He has been

4    punished, in that sense, severely.  I think the comment was it

5    is the largest fine in history -- $53 million -- and I think

6    that is probably right.

7            And the other argument the government makes -- and

8    properly so -- if we measure his wealth, it is a small

9    percentage.  But that is one way of looking at it, but it is

10   also a lot of money for the government to defray whatever the

11   expenses of running the government are.

12           So, anyway, that is how I see the case.

13           It has not been easy to decide.  I struggled over it;

14   but, in the end, I think that is the proper and just sentence.

15   And I can live with it.

16           That will be the sentence in this case.

17           (Brief pause.)

18           THE COURT:  Okay.  Just a second.  We are not quite

19   through.

20           The government has something?

21           MR. KING:  Do you want to advise him of his appeal

22   rights, Judge?

23           THE COURT:  Oh.

24           I am going to advise you of your right to appeal; and,

25   if you think you can get a better deal in the Court of Appeals,

1   by all means --

2          (Laughter.)

3          THE COURT:  -- be my guest.

4          The government knows it has a right to appeal.  And I

5   deviated from the Guidelines, as even, I think, you did, as

6   well, in your remarks, which I thought were, at least, quite

7   reasonable as to what a sentence should be.

8          But you know you have a right to appeal.  And the door

9   is open for you.  All right?

10          THE PROBATION OFFICER:  Your Honor, a couple of

11   housekeeping matters --

12          THE COURT:  Yes.

13          THE PROBATION OFFICER:  -- for Probation?

14          The fine is due within 30 days?

15          THE COURT:  Yes, 30 days.

16          THE PROBATION OFFICER:  And the special assessment?

17          THE COURT:  Yes, all of it.

18          THE PROBATION OFFICER:  And the standard conditions of

19   supervision?

20          THE COURT:  Absolutely.

21          THE PROBATION OFFICER:  One last thing, because I know

22   it will become an issue later.

23          His travel overseas, no restrictions?

24          THE COURT:  No restrictions.

25          THE PROBATION OFFICER:  Thank you.

1          MR. SCANDAGLIA:  Thank you, your Honor.

2          THE COURT:  All right?

3          MR. SCANDAGLIA:  Yes.

4          THE COURT:  Thank you.

5                         *   *   *   *   *

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
7

8    /s/ Joene Hanhardt              January 15, 2014
     Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25