In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 14-1330

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

H. TY WARNER,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00731 — **Charles P. Kocoras**, *Judge*.

———————————

ARGUED SEPTEMBER 17, 2014 — DECIDED JULY 10, 2015

———————————

Before FLAUM, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Defendant H. Ty Warner, the billionaire creator of Beanie Babies, evaded $5.6 million in U.S. taxes by hiding assets in a Swiss bank account. He pled guilty to one count of tax evasion, made full restitution, and paid a $53.6 million civil penalty. The Sentencing Guidelines provided a recommended 46- to 57-month term of imprisonment, but the district judge gave Warner a more lenient sentence: two years' probation with community service, plus

a $100,000 fine and costs. The government claims his sentence is unreasonable because it does not include a term of incarceration.

In a typical case, we might agree. But this is not a typical case. The district judge found Warner's record of charity and benevolence "overwhelming." Indeed, the judge remarked that Warner's conduct was unprecedented when viewed through the judge's more-than-three decades on the bench. In the district court's opinion, this and other mitigating factors—including the uncharacteristic nature of Warner's crime, his attempt to disclose his account, his payment of a penalty ten times the size of the tax loss, and the government's own request for a sentence well below the guidelines range—justified leniency. District courts enjoy broad discretion to fashion an appropriate, individualized sentence in light of the factors in 18 U.S.C. § 3553(a). The court here did not abuse its discretion. Rather, it fully explained and supported its decision and reached an outcome that is reasonable under the unique circumstances of this case. We therefore affirm Warner's sentence.

## I. BACKGROUND

Warner was born in Chicago in 1944 and grew up in a troubled family. He attended a military high school in Wisconsin and spent a year at Kalamazoo College, but ultimately dropped out because he could no longer afford tuition. To make ends meet, he worked a series of odd jobs, including stints as a busboy, a bellman, and a door-to-door salesman. Eventually, he found his feet selling children's plush toys for the Dakin Toy Company. Within a few years, he was Dakin's top salesman.

In 1985, Warner formed his own plush toy company, Ty Inc., which he initially ran by himself out of his condominium. His big break came in the early 1990s with the introduction of a new toy to the market: the Beanie Baby. A huge success, the Beanie Baby propelled Ty Inc. into a multi-billion-dollar company and made Warner rich. His net worth at the time of sentencing was roughly $1.7 billion.

*A. Warner's Tax Evasion and Attempted Disclosure*

In 1996, during the early period of Beanie Babies' success, Warner traveled to Zurich, Switzerland, and opened an off-shore bank account at UBS AG ("UBS"). The record does not disclose how much money Warner originally deposited or where the funds came from, but within several years the account contained $93 million. Consistent with their advice, Warner instructed his bankers not to send him any correspondence and to destroy all account documents after five years. He did not report the account to the Internal Revenue Service ("IRS").

Warner was not the only American taxpayer hiding assets at UBS. With the help of bankers in UBS's cross-border division, many others opened offshore accounts to avoid U.S. taxes. One of the bankers involved in this fraudulent scheme was Hansreudi Schumacher, who serviced Warner's account. After UBS entered into a Qualified Intermediary Agreement with the IRS in 2001 (which created certain tax reporting obligations), Schumacher left to join another Swiss bank.

Warner followed him. In late 2002, Warner traveled to Switzerland and, with Schumacher's help, transferred his funds from UBS to Zuercher Kantonalbank ("ZKB"), a smaller Swiss bank without a significant U.S. presence. He

placed the funds at ZKB in the name of a Liechtenstein shell entity, the "Molani Foundation." And he instructed UBS "not to engage in any sort of communication with me re transfer," but instead to send all correspondence to Schumacher. At ZKB, Warner's account grew to over $107 million.

Warner did not disclose his offshore account to the IRS. On the contrary, he reported on his annual tax returns that he had no foreign financial account. And he did not report or pay taxes on the interest income generated by his offshore assets, which amounted to over $24.4 million through 2007. As a result, the government lost $5,594,877 in tax revenue— the second-highest loss among the former UBS clients who have been prosecuted to date.

In 2008 the Department of Justice launched a program to aggressively combat offshore tax evasion.[1] The program began with an investigation of UBS. In April the government indicted former UBS banker Bradley Birkenfeld. In February 2009 it filed a one-count information against UBS and quickly executed a deferred prosecution agreement, under which UBS admitted wrongdoing and agreed to hand over information on certain U.S. offshore clients. Several months later, the government brought charges against former UBS and Schumacher client Jeffrey Chernick. In August 2009 Schumacher himself was indicted.

At the same time, the government encouraged tax-evaders to come forward on their own by announcing an IRS offshore voluntary disclosure program in March 2009 (the "OVDP"). Under the program, taxpayers who voluntarily

---

[1] *See generally* http://www.justice.gov/tax/offshore-compliance-initiative (last visited July 9, 2015).

disclosed their offshore accounts could avoid criminal pros-
ecution by paying back taxes, interest, and penalties, includ-
ing 20% of the account's peak value. On the other hand,
those who continued to hide their assets would face height-
ened enforcement and severe penalties. Taxpayers had a six-
month window—until September 23, 2009 (later extended)—
to take advantage of the OVDP. Thousands of taxpayers
were admitted into the program.[2]

Warner was aware of the government's investigation of
UBS, which was widely publicized, and of Schumacher's in-
dictment. Warner says that he regretted his decision to open
the offshore account from the beginning but felt stuck; and
that he never withdrew or otherwise used the funds in the
account. In 2009 he contacted his lawyer to discuss his op-
tions, and his lawyer told him about the OVDP. On Septem-
ber 18, 2009—just before the original deadline—Warner ap-
plied to enter the program. Unbeknownst to him, however,
he was already under investigation; the government had ob-
tained his account information in 2008 or 2009, possibly from
UBS. The pending investigation made Warner ineligible for
the OVDP, s*ee* IRM § 9.5.11.9(4)(a), (b) (Sept. 9, 2004), so the
government rejected his application.

Two years later, in 2011, a grand jury subpoenaed Warn-
er's offshore banking records. He resisted the subpoena, but
we ultimately required him to comply. *In re Special Feb. 2011-
1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d 903, 909
(7th Cir. 2012), *cert. denied*, 133 S. Ct. 2338 (2013).

---

[2] Information on the 2009 disclosure program and its successors is avail-
able on the IRS's webpage at http://www.irs.gov/uac/2009-Offshore-
Voluntary-Disclosure-Program (last visited July 9, 2015).

*B. Warner's Information and Guilty Plea*

In September 2013 the government filed a one-count information charging Warner with willful tax evasion in violation of 26 U.S.C. § 7201. The information alleged that Warner evaded $885,300 in taxes for 2002 by: (1) excluding from his reported income the interest from his offshore assets; (2) fraudulently stating on his tax return that he had no foreign account; and (3) failing to file a Report of Foreign Bank and Financial Account (an "FBAR" form), as required by the Bank Secrecy Act and implementing regulations, *see* 31 U.S.C. § 5314.

In October 2013 Warner pled guilty to the one-count information. As part of his plea agreement, he also admitted to similar misconduct from 1996 to 2007, which he agreed constituted "relevant conduct" under U.S. Sentencing Guidelines Manual § 1B1.3 (Nov. 2012) ("USSG"). He promised to pay full restitution and a civil FBAR penalty of $53,552,248—equal to 50% of the maximum balance in his offshore account in 2008 (which is 30% higher than the penalty he would have owed had he been admitted to the OVDP). As far as we are aware, Warner's $53.6 million payment is the largest FBAR penalty the government has collected to date. Warner paid both the penalty and restitution before his sentencing hearing.

Warner's plea deal included an agreed-upon guidelines calculation. The base offense level for a tax loss of $5.6 million was 24 under USSG §§ 2T1.1 and 2T4.1(J). The parties agreed to add 2 levels under USSG § 2T1.1(b)(2) because the offense involved sophisticated means, subtract 2 levels for acceptance of responsibility under USSG § 3E1.1(a), and subtract 1 more under USSG § 3E1.1(b) because Warner's guilty

plea obviated the need to prepare for trial—resulting in a final offense level of 23. Because Warner had no prior convictions, his criminal history category was I. This yielded an advisory guidelines range of 46 to 57 months' imprisonment. *See* USSG ch. 5, pt. A (sentencing table).

Beyond stipulating to the guidelines calculation, the plea agreement left each side free to argue for whatever sentence it deemed appropriate.

*C. Sentencing*

In their pre-sentencing submissions, neither side proposed a sentence within the guidelines range. The government requested incarceration "in excess of a year and a day," a sentence well below the recommended minimum. The probation officer recommended a prison term of 15 months. Warner argued that a sentence of probation with community service would suffice, and that it would provide greater benefit to society. He offered to mentor students in business and product development at three urban high schools on Chicago's South Side. The president of one of the schools submitted a letter detailing specific ways that Warner could help. In addition, approximately seventy people—business associates, employees, neighbors, charitable foundations, and others who knew Warner—submitted character-reference letters in his behalf.

The sentencing hearing took place on January 14, 2014, before District Judge Kocoras. After argument from both sides, the court pronounced Warner's sentence and explained its decision. The court also issued a short written statement of reasons to supplement its oral explanation. The hearing transcript runs fifty-five pages.

The district court adopted the findings in the presentence report and agreed with the calculation of the guidelines range. But the court decided to impose a below-guidelines sentence based on "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The court was moved by the letters submitted in Warner's behalf, which were "quite different" from the letters it typically received in other cases: they were voluminous, detailed, and revealed Warner's "personal qualities, which differ from those he manifested in committing the crimes he has admitted." The court read several letters into the record. For brevity's sake, we give only a partial summary.

One letter related that in 2012 Warner stopped to ask a stranger for directions in Santa Barbara, California. Her name was Jennifer Vasilakos, and she was holding a fundraiser called "Parking for Jenny." In addition to directions, she gave him a flyer explaining that she suffered from kidney failure and needed money to pay for an expensive adult stem cell treatment. An hour later, after reading the flyer, Warner returned and promised to pay the full amount she needed ($20,000). He followed through, but "[his] generosity went further than simply donating." He helped her "raise awareness" and connected her with others interested in the potential of adult stem cells for treating kidney failure. As a result, she has met with leaders in the field, toured laboratories, and "altered the path of research."

Another letter came from the president of the Children's Hunger Fund, an organization serving needy children in orphanages, disaster-stricken areas, and elsewhere. Over thirteen years, Warner donated millions of plush toys valued at

$70 million and enabled numerous charitable projects. The president called Warner's generosity "nothing short of amazing" and "unprecedented" in his thirty-plus years in the non-profit sector. What is more, "in every instance," he noted, Warner "ha[d] humbly requested that no special efforts be made to publicly acknowledge his philanthropy."

In a third letter, the director of financial reporting for Warner's company called him "the most benevolent person I have ever met." He explained, for example, that when Ty Inc. broke $1 million in annual sales, Warner surprised his employees with an annual bonus equal to one year's salary; he also maintained his sales team's high commission rates, making many of them millionaires.

The other letters that the district court read at the hearing told similar stories. For example, in honor of Princess Diana, Warner designed a plush toy and donated $20 million in profits to her memorial fund. To commemorate a friend's 18-year-old son who had succumbed to cancer, Warner created an Issy Bear and donated $2 million in profits for cancer research. He gave $6.3 million to a charter school in Las Vegas; donated $13 million to enable the acquisition and development of a park in Westmont, Illinois; and gave $2 million for disaster relief in Japan. In addition to these letters, the court noted that dozens more "describe[d] a host of other actions, large and small, which reflect on Mr. Warner and are entitled to consideration in determining a just sentence for him."

The district court found that "Mr. Warner's private acts of kindness, generosity and benevolence are overwhelming." Moreover, many of them took place long before Warner knew he was under investigation; the court found they were "motivated by the purest of intentions" and "without a view

toward using [them] at sentencing." Most were "done quiet-ly and privately." The district judge, who has been on the bench for more than thirty years, then remarked: "Never have I had a defendant in any case—white collar crime or otherwise—demonstrate the level of humanity and concern for the welfare of others as has Mr. Warner."

The court also discussed the other § 3553(a) factors, which it acknowledged "run in different directions." On the one hand, the court emphasized the need to maintain the "dignity of the law," to treat "the rich and the poor similar-ly," and to deter other tax-evaders. It recognized that Warner "hid a substantial amount of money" for many years, and that his crime was "a serious one [which] goes to the essence of how we govern ourselves." The court also acknowledged the government's comparisons to other tax evaders who had received prison sentences despite having lower tax losses than Warner, though it found the comparisons unhelpful be-cause Warner was "very unique."

On the other hand, the court found that Warner con-cealed only a "small fraction" of his total income and tried to come clean through the OVDP "prior to him knowing his name had been submitted to the [IRS]." Moreover, in one sense, Warner had already been "punished … severely" by paying a penalty of over $53 million—possibly "the largest fine in history" and "more than he ever would have paid had he filed the returns and included all of the income," though it was admittedly only "a small percentage" of Warner's total wealth. He also suffered the "humiliation" of a "highly publicized prosecution." Warner was 69 years old, had no prior criminal history and, in the district court's view, was extremely unlikely to commit any further crimes. The

No. 14-1330                                                    11

district court also noted Warner's prompt payment of his civil liabilities and his compliance with the plea agreement.

Having examined the relevant factors, the district judge said it was now "left to me to weigh them all and balance them, as best … I am humanly able." He candidly admitted that it was a "hard question" whether to incarcerate Warner, and that he "struggled over it." But in the end he found that Warner's good works "trump[ed]" his misconduct and that "society will be best served by allowing him to continue his good works" outside of prison. A sentence below the guidelines range was fitting, the court explained, because "the Guidelines do not describe similarly situated defendants"; Warner was "very unique." The government itself had recommended a well-below-guidelines sentence—an approach the court commended as "quite reasonable."

The district court sentenced Warner to two years' probation, subject to standard conditions and a special condition requiring at least 500 hours of community service at the three South Side high schools he had identified. The court also fined Warner $100,000—the maximum amount authorized by 26 U.S.C. § 7201—and ordered him to pay costs.

The government timely appealed. The district court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b).

## II. ANALYSIS

The government contends that Warner's sentence is unreasonable because it does not include a prison term. For the reasons that follow, we disagree.

For starters, no statute expressly required the district court to send Warner to prison. The law that Warner violat-

ed, 26 U.S.C. § 7201, permits the court to impose a fine instead, which it did here. And Warner was eligible for probation under 18 U.S.C. § 3561.

It was therefore up to the district court to select an appropriate sentence in accordance with the factors in 18 U.S.C. § 3553(a). One of those factors is the type and range of sentence established by the guidelines. 18 U.S.C. § 3553(a)(4). After *United States v. Booker,* however, the guidelines are merely advisory. 543 U.S. 220, 245 (2005). While the § 3553(a) analysis still begins with a consideration of the guidelines, it does not end there. *Rita v. United States*, 551 U.S. 338, 351 (2007). The sentencing judge may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case. *See Gall v. United States*, 552 U.S. 38, 50 (2007). The guidelines range is only "a rough approximation of sentences that might achieve § 3553(a)'s objectives" in the "mine run of cases." *Rita*, 551 U.S. at 350-51. It supplies "the starting point and the initial benchmark," but nothing more. *Gall*, 552 U.S. at 49.

The district court must next consider the other § 3553(a) factors. *Id.* at 49-50. The first factor encompasses both "the nature and circumstances of the offense" and "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The second demands a sentence that is "sufficient, but not greater than necessary" to accomplish the basic purposes of sentencing: just punishment, deterrence, incapacitation, and rehabilitation. *Id.* § 3553(a)(2). The sixth factor is "the need to avoid unwarranted sentence disparities" among similarly situated defendants. *Id.* § 3553(a)(6). The others are: the types of sentence available, sentencing policy statements, and the need for restitution. *Id.* § 3553(a)(3), (5), (7).

Ultimately, it falls on the district court to weigh and balance the various factors and to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50; *see also id.* at 52 (viewing "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue" (citation omitted)). The open-endedness of the § 3553(a) factors leaves ample room for the court's discretion. *See United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007). Once the court chooses a sentence, § 3553(c) requires the district judge to "state in open court the reasons" for imposing it. The explanation need not be exhaustive as long as it "allow[s] for meaningful appellate review and … promote[s] the perception of fair sentencing." *United States v. Omole*, 523 F.3d 691, 697 (7th Cir. 2008) (quoting *Gall*, 552 U.S. at 50). The court is free to select a sentence outside the guidelines range, *see Kimbrough v. United States*, 552 U.S. 85, 91 (2007), but it must explain and support the magnitude of the variance, *United States v. Molton*, 743 F.3d 479, 484 (7th Cir. 2014).

We review a district court's choice of sentence in two steps. *Gall*, 552 U.S. at 51. First, we assess *de novo* whether the court followed proper procedures. *United States v. Nania*, 724 F.3d 824, 830 (7th Cir. 2013). If the decision below is procedurally sound, then we ask whether the resulting sentence is "substantively reasonable." *Id*. Unlike the sentencing judge, we may presume on appeal that a within-guidelines sentence is reasonable. *Rita*, 551 U.S. at 341. But we may not presume that a sentence outside the guidelines range is *unreasonable*. *Gall*, 552 U.S. at 51. Instead, we must decide whether the district court's justification is sufficient, applying a deferential abuse of discretion standard. *Id*. at 40; *Molton*, 743 F.3d at 484. We will not substitute our judgment for

that of the district court. *Wachowiak*, 496 F.3d at 751. For we are mindful that substantive reasonableness occupies "a range, not a point," *id.*, and that "the sentencing judge is in the best position to apply the § 3553(a) factors to the individual defendant," *Omole,* 523 F.3d at 698.

Thus, we will uphold a variant (*i.e.*, outside-the-guidelines) sentence so long as the district court's reasoning (1) rests on reliable evidence, *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009); (2) is consistent with § 3553(a), *Molton*, 743 F.3d at 484; and (3) yields a sentence "within the broad range of objectively reasonable sentences in the circumstances," *Wachowiak*, 496 F.3d at 750. A variant sentence is most likely to pass muster if it is based on considerations particular to the defendant or the case, as opposed to "normal incidents of the offense or the judge's wholesale disagreement with the guidelines." *Wachowiak*, 496 F.3d at 750. In general, a disagreement about how much weight to give each § 3553(a) factor does not warrant reversal. *See Molton*, 743 F.3d at 485; *accord United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) ("The weight to be afforded any given argument made pursuant to one of the § 3553(a) factors is a matter firmly committed to the discretion of the sentencing judge….").

*A. Procedural Reasonableness*

While the government primarily takes aim at the substance of Warner's sentence, it also claims in several footnotes that the district judge procedurally erred by overlooking two of the § 3553(a) factors: the need to deter other tax-evaders and to avoid unwarranted sentencing disparities. Setting aside the question whether the government preserved this argument, *see Harmon v. Gordon*, 712 F.3d 1044,

1053 (7th Cir. 2013) ("[A] party can waive an argument by presenting it only in an undeveloped footnote."), we reject it on the merits.

Failure to consider the § 3553(a) factors or to adequately explain the choice of sentence can amount to procedural error. *See Gall*, 552 U.S. at 51. But the "sentencing court need not comprehensively discuss each of the factors," *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009)**,** or march through them **"**in checklist fashion, explicitly articulating its conclusions regarding each one," *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008).

The district court here addressed the § 3553(a) factors and explained their relevance to Warner's sentence, exactly as it was supposed to do. In particular, the court expressly addressed both deterrence (which it found sufficient) and sentencing disparities (finding "the variety of comparisons made by both sides" unhelpful because Warner was "very unique"). The government's real complaint is that the district court did not, in its view, *adequately* address its arguments. But that issue goes to the substance of Warner's sentence. As a procedural matter, the court's explanation was more than sufficient.

### B. Substantive Reasonableness

That brings us to the heart of this appeal. We begin our review for substantive reasonableness by stating the obvious: Warner's sentence is well below the guidelines recommendation. He received both a shorter sentence (24 rather than 46 to 57 months) and a lighter one (probation rather than prison). Although, as noted above, Warner was eligible for probation under 18 U.S.C. § 3561, the guidelines advised

16                                                    No. 14-1330

imprisonment rather than probation due to the length of his
sentencing range. *See* USSG § 5B1.1(a).

We must decide whether the district court's explanation
justifies Warner's sentence, including the magnitude of its
deviation from the guidelines. *Molton*, 743 F.3d at 484. No
one disputes that he deserved a below-guidelines sentence.
The dispute centers instead on *how far* below the guidelines
the court should have gone. Warner requested probation.
The government proposed over a year and a day in prison—
which would have made Warner eligible for good-time cred-
it, likely reducing his actual time served to less than a year.
*See* 18 U.S.C. § 3624(b)(1). While the court was not strictly
bound by their recommendations, it was well within the
court's discretion to use that range as a benchmark. S*ee Gall*,
552 U.S. at 49-50 (directing the court to determine whether
the § 3553(a) factors "support *the sentence requested by a par-
ty*" (emphasis added)). The real choice before the district
court, then, was between probation and roughly a year in
prison—not 46 to 57 months.

Did the district court choose reasonably between those
alternatives? The government says no. It argues that in ana-
lyzing the § 3553(a) factors, the court made numerous errors
and ultimately put too much weight on Warner's charitable
contributions and letters of support (factor 1), and too little
weight on the seriousness of his offense (factor 2(A)), general
deterrence (factor 2(B)), and sentencing disparities (factor 6).
We address each factor in turn.

*1. Characteristics of the Defendant*

Section 3553(a)(1) instructs the sentencing judge to con-
sider "the history and characteristics of the defendant." A

defendant's record of charity may justify a lenient sentence. Though our earlier cases required "exceptional" good works, *United States v. Repking*, 467 F.3d 1091, 1095 (7th Cir. 2006) (per curiam), the Supreme Court has since "reject[ed] … an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range," *Gall*, 552 U.S. at 47. Accordingly, to survive appellate review, a defendant's good works must be sufficient to justify the variant sentence, but they need not necessarily be exceptional.

Relying mainly on Warner's letters of support, the district court found his charitable works and the generosity they bespeak overwhelming—indeed, unprecedented in the district judge's experience. This was the primary mitigating factor that drove the court toward a lenient sentence. The government attacks the court's assessment on two grounds.

First, the government questions the value of Warner's letters because many of them came from his employees, former employees, business associates, and attorneys; and because some of the good deeds they report took place after Warner knew he was under investigation. But the district court addressed both points. It noted the source of the letters and yet found them sincere and credible. And it specifically found that Warner's generosity went back many years, that his motivations were sincere, and that he was not trying to game the system or create a record to use at sentencing. Given the record before us, these findings are not clearly erroneous. *See United States v. Gordon*, 513 F.3d 659, 666 (7th Cir. 2008).

Second, the government argues that Warner's charity amounts to no more than "writing checks [and] donating excess inventory," which is "nothing unique" considering his "enormous wealth." Though Warner says he donated $140

million, about 8% of his net worth, the government asserts the correct figure is $35.7 million, about 2% of his net worth.[3] The government raised this dispute below in a footnote, so the district court understandably did not resolve it.

Whatever the correct figure may be, the government misses the point of the district court's remarks. Although it praised Warner for giving away many millions of dollars, the court did not focus on the number of checks Warner wrote or their dollar amounts. It focused instead on what Warner's charitable acts reveal about his *character*, which is exactly what § 3553(a)(1) directs us to consider. For example, the court read the letter from Ms. Vasilakos first and in its entirety, even though the $20,000 Warner donated for her treatment was a relatively small sum. What was remarkable was that Warner helped a total stranger and that his "generosity went further than simply donating." The court also highlighted Warner's insistence that the Children's Hunger Fund not publicize his philanthropy, as well as Warner's kindness to his employees. None of the court's comments fixated on the amount of money involved. What struck the court was that Warner displayed such "humanity and concern for the welfare of others" and acted with "the purest of intentions," often "quietly and privately." *Cf.* Matt. 6:3-4 (RSV) ("[W]hen you give alms, do not let your left hand know what your right hand is doing, so that your alms may be in secret.")

---

[3] Warner's figure includes the retail value of toys he donated to charities; the government claims those toys should be valued at their actual cost to the defendant. Warner's figure also includes donations for which, according to him, he did not claim deductions on his tax returns; the government's figure does not include those additional donations.

No. 14-1330    19

The government was free to challenge the district court's assessment of Warner's character below, but we will not disturb the court's findings on appeal. As we stated above, they have ample support in the record and are not clearly erroneous. Nor did the district court err by placing as much weight as it did on Warner's character. Though we ourselves might have given this factor less weight compared to others, the court did not abuse its discretion. *See Gall*, 552 U.S. at 51 ("The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."); *Fernandez*, 443 F.3d at 32 (committing the assignment of weight to the § 3553(a) factors to the sentencing judge's discretion).

Our conclusion is consistent with the cases cited by the government, *Repking* and *United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010). In *Repking*, we vacated as substantively unreasonable a below-guidelines one-day sentence for a bank president who misappropriated funds. 467 F.3d at 1091-92. The district judge's offhanded reference to "unspecified 'good works'" that were "entirely consistent with a bank's business development plan" did not justify such leniency. *Id.* at 1093, 1096. This case is different: among other mitigating facts, the district court specified in detail with reference to the record what good works Warner did and what they revealed about him as a person. The court found, moreover, that Warner was motivated by genuine benevolence rather than ulterior aims.

In *Vrdolyak*, we reversed a below-guidelines probationary sentence for conspiracy to commit mail and wire fraud. 593 F.3d at 684. The defendant there had "a history of ethical misconduct," but the district court ignored it; it also over-

looked the defendant's wealth. *Id.* at 682. Warner, by contrast, has a clean history apart from his tax evasion, and the district court recognized both his crime and his wealth. Moreover, because *Vrdolyak* was a procedural challenge, we expressed "no view on what a proper sentence would be." *Id.* at 684. But that is precisely the question before us now; *Vrdolyak* does not speak to it.

Nor are we allowing Warner to use his wealth as a "get-out-of-jail card," *id.* at 682, as the government charges. The district court looked behind the numbers to Warner's character and found him to be a genuinely benevolent person. A non-wealthy defendant who showed similar qualities would be entitled to similar treatment (all else being equal). And a rich defendant who gave large gifts without real concern for others, or who did so cynically to give himself an argument at sentencing, would not deserve the same leniency.

### 2. Seriousness of the Offense

Section 3553(a) demands "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. One of those purposes is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). The district court here recognized Warner's crime as "a serious one" and respect for the law as "fundamental." According to the government, however, this was mere lip service, for Warner's sentence does not justly punish him or convey the seriousness of evading $5.6 million in taxes.

In another case, justice might demand a harsher sentence, but here it does not. To begin with, the government itself took a fairly lenient approach to Warner's punishment. It

charged him with a single count of tax evasion for a single year and elected to treat his conduct in the other years as relevant for sentencing purposes rather than to charge them as separate crimes. Additionally, as we noted above, the government sought a sentence well below the guidelines range. Both decisions were within the government's prosecutorial discretion, and we do not second-guess them. But they started the district court down a path toward leniency.

It was reasonable for the district court to follow that path here. For a sentencing judge must consider not only the seriousness but also the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). The court noted several mitigating circumstances in Warner's case. His crime was isolated and uncharacteristic: he had kept only one offshore account containing "a small fraction" (about 6%) of his total wealth. He was 69 years old, had no prior criminal history, and posed no danger to society. In particular, the court found, there was "no question of him violating the tax laws in the future." Moreover, he cooperated by pleading guilty and promptly paying both full restitution and the FBAR penalty, although, it is true, his cooperation was incomplete (e.g., he resisted the government's subpoena and did not disclose the source of his offshore assets).

The district court also appropriately took into account Warner's attempt to enter the OVDP in September 2009. It is true that Warner already knew about the UBS investigation and Schumacher's indictment, so he was on notice of some probability that his own account would be discovered. That lessens the mitigating force of his attempted disclosure but does not eliminate it. Many other offshore-accountholders were similarly on notice, given the IRS's widely publicized

prosecutions and enforcement efforts; yet many of them were eventually admitted into the OVDP anyway. The salient fact, in the district court's view, is that Warner came forward before he knew the IRS had his name or that he was under investigation. It was reasonable to consider this a mitigating fact. *Cf. United States v. Tenzer*, 213 F.3d 34, 42-43 (2d Cir. 2000) (treating as mitigating a defendant's failed attempt to enter an IRS voluntary disclosure program).

In these circumstances, we think probation was a sufficiently serious sentence. The Supreme Court reminded us in *Gall* that probation involves a "substantial restriction of freedom," and faulted the court below for discounting that fact. 552 U.S. at 48. For two years Warner will live under restrictions on his movement and activities, and he must perform at least 500 hours of community service. Moreover, he paid a $100,000 fine, the highest possible amount for a violation of 26 U.S.C. § 7201.

In addition, Warner paid full restitution and a $53.6 million FBAR penalty. Technically the FBAR penalty is civil rather than criminal in nature. *See* 31 U.S.C. § 5321. But it stems from the same conduct as his criminal conviction; in fact, the government specifically cited his FBAR violations in the information as evidence of his criminal tax evasion. Further, the FBAR penalty was part of Warner's plea agreement. It is therefore one of the circumstances that informs our assessment of his sentence's adequacy. *Cf.* USSG § 5E1.2(d)(5) (instructing the court, when determining fines, to consider "any collateral consequences of conviction, including civil obligations arising from the defendant's conduct"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (per curiam) (upholding a probationary sentence for insider trading

based in part on the defendant's payment of restitution and a civil penalty to the SEC).

The government now tries to downplay Warner's FBAR penalty, claiming it represents only a fraction of the liability he faced. According to the government, it could have charged Warner a separate penalty for *each year* he hid his account. Even assuming the relevant statute, 31 U.S.C. § 5321(a)(5)(C)-(D), would allow separate annual penalties, the six-year limitations period would have restricted the government's recovery to two or maybe three years. *See* 31 U.S.C. § 5321(b)(1). In addition, the government would have had to prove that Warner's violations were willful. *Id.* § 5321(a)(5)(C). Moreover, if $53.6 million were insufficient, the government could have insisted on more before entering into the plea agreement.

The government points out, citing *Gall*, that "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms." 552 U.S. at 48. That is true, and in that sense incarceration sends a stronger message than probation does. But § 3553(a) does not command courts to send the strongest message possible; it commands them to impose a sentence that is "sufficient, *but not greater than necessary*" in the circumstances of each case. 18 U.S.C. § 3553(a) (emphasis added). The district court concluded that in Warner's case a probationary sentence met that standard. That conclusion was reasonable.

### 3. General Deterrence

Another important goal of sentencing is "to afford adequate [general] deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). White collar criminals seem like "prime can-

didates for general deterrence," *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013), because they (presumably) act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity. The guidelines thus make "deterring others from violating the tax laws … a primary consideration." USSG § 2T1.1, intro. cmt. And they seek to increase the proportion of offenders who receive prison sentences above pre-guidelines levels. *See* USSG § 2T1.1, cmt. (background). Although the guidelines' policies are not controlling, *see United States v. Bonner*, 440 F.3d 414, 417 (7th Cir. 2006), we have no quarrel with the general proposition that effective deterrence of tax crimes requires a credible threat of imprisonment. *Cf. United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (recognizing the need for significant penalties to compensate for the rewards and difficulty of detecting economic crimes). But that does not necessitate imprisonment in every case.

While incarcerating Warner undoubtedly would have sent a *stronger* message, the message sent by his existing sentence is, in our view, strong enough to satisfy § 3553(a)(2)(B). We reach this conclusion for two reasons. First, the veteran district judge found Warner to be one of a kind. Almost by definition, very few defendants will make that kind of impression on a sentencing judge. So Warner's sentence tells others very little, if anything, about what treatment they would receive for a similar crime. In particular, other, more typical defendants should take no comfort in the fact that Warner avoided imprisonment.

Second, even without a prison sentence, Warner's payment of a $53.6 million penalty already provides a measure of deterrence. *See United States v. Sklena*, 692 F.3d 725, 732

No. 14-1330                                                    25

(7th Cir. 2012) (recognizing that a large civil penalty can have a "deterrent effect … similar to that of a criminal sentence"). From an economic point of view, deterrence is sufficient when the penalty for a crime multiplied by the probability of apprehension equals the harm done—in this case, the taxes evaded. *See DirecTV, Inc. v. Barczewski*, 604 F.3d 1004, 1010 (7th Cir. 2010) (citing Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J. Pol. Econ. 169 (1968)); *United States v. Rogan*, 517 F.3d 449, 454 (7th Cir. 2008) (citing A. Mitchell Polinsky and Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869 (1998)). If the prospect and severity of punishment are high enough, then the risks of tax evasion exceed the rewards, and so would-be offenders will refrain (at least in theory).

Warner's FBAR penalty was nearly ten times the size of the tax loss he caused (not accounting for interest). The missing variable is the probability of apprehending the offshore tax-evader. Even without that figure, though, it is reasonable to think, as the district court did, that a tenfold penalty is sufficient in Warner's case. Congress apparently intended FBAR penalties to have a deterrent effect, *see* 31 U.S.C. § 5321(a)(5)(C), and it has employed multiples lower than ten to stem other types of economic harm, *see, e.g.*, 15 U.S.C. § 15(a) (authorizing treble damages for antitrust violations); 18 U.S.C. § 1964(c) (treble damages for RICO violations); 31 U.S.C. § 3729(a)(1) (treble damages for False Claims Act violations). The fact that Warner's penalty was only 3% of his net worth does not, as the government contends, blunt its deterrent force. For "[t]he wrongdoer's wealth plays no role" in the economic approach to deterrence outlined above. *DirecTV*, 604 F.3d at 1010.

Case: 1:13-cr-00731 Document #: 47 Filed: 08/03/15 Page 26 of 33 PageID #:514
Case: 14-1330     Document: 00712579486     Filed: 08/03/2015     Pages: 33

The government points to *United States v. Engle*, where the Fourth Circuit, citing the guidelines' view that deterrence requires a real risk of incarceration, vacated a probationary sentence for tax evasion. 592 F.3d 495, 502 (4th Cir. 2010). *Engle*, however, was at best a "'mine-run' tax-evasion case." *Id.* at 503. The defendant there, unlike Warner, did not pay a large penalty or possess unique characteristics that could justify a low sentence. On the contrary, the facts in *Engle* "could perhaps be viewed as warranting an *above*-Guidelines sentence," *id.* at 503 (emphasis added), which no one suggests would have been appropriate here.

Finally, the government takes issue with the district court's statement that Warner's highly publicized prosecution and attendant humiliation provided some deterrence. The government argues that humiliation is a normal consequence of a fraud conviction. While Warner's prosecution has been more public than most, we agree that this fact deserves little, if any, weight. *See Repking*, 467 F.3d at 1096. But as we read the transcript, Warner's humiliation played no significant role in the court's sentencing determination. And in any event his sentence would stand without it.

### 4. Sentencing Disparities

The government's final contention is that Warner's sentence creates "unwarranted sentence disparities" in violation of § 3553(a)(6). The government points to four former UBS clients who received prison terms of a year and a day with tax losses lower than Warner's: Peter Troost (who evaded approximately $1 million), Christopher Berg ($270,000), Federico Hernandez ($500,000), and Richard Werdiger ($400,000). The government insists that Warner should have

No. 14-1330                                                    27

received a prison term at least as long as theirs. The district court disagreed—again, because Warner is unique.

We uphold the district court's conclusion. Section 3553(a)(6) forbids not all sentencing disparities but only "unwarranted" ones "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3556(a)(6). Warner is not similar to the government's comparators. None of them offered evidence of significant charity or otherwise impressed the district court with their personal character, as Warner did. None of them, with the exception of Werdiger, tried to enter the OVDP or paid an FBAR penalty comparable to Warner's. Two of them were convicted on numerous counts: six in Werdiger's case, five in Hernandez's. And in all four instances the government sought a sentence within the advisory guidelines range.[4] These were "mine run" cases. *Rita*, 551 U.S. at 351. Warner's case is not.

Furthermore, probation is a common sentence in offshore tax evasion cases. The evidence introduced below shows that roughly half of the defendants convicted since 2008 have received terms of probation rather than imprisonment. And, of course, thousands more have avoided criminal prosecution altogether by entering the OVDP. The government correctly

---

[4] *See United States v. Troost*, No. 1:13-cr-00185 (N.D. Ill.), plea agreement at 6, 11 (ECF No. 12), sent. hr'g tr. at 26-30 (ECF No. 23), judgment (ECF No. 19); *United States v. Berg*, No. 5:12-cr-00877-LHK (N.D. Cal.), gov't sent. mem. at 3 (ECF No. 15), sent. hr'g tr. at 50-53 (ECF No. 27), judgment (ECF No. 20); *United States v. Hernandez*, No. 1:10-cr-00334-DC (S.D.N.Y.), gov't sent. mem. (ECF No. 11), judgment (ECF No. 12); *United States v. Werdiger*, No. 1:10-cr-00325-PGG (S.D.N.Y.), judgment (ECF No. 30), sent. hr'g tr. at 32, 45-55 (ECF No. 31).

emphasizes that the defendants sentenced to probation were different from Warner: for example, they caused smaller tax losses, and several of them gave more information to the government. But they are at least *as similar* as the government's comparators. Paul Zabczuk, for example, tried to disclose his offshore account through the OVDP, was rejected, and received three years' probation despite the government's request for an 18-month prison sentence. And Igor Olenicoff hid millions of dollars in offshore accounts, paid the IRS $52 million, and received two years' probation based in part on his "exemplary community service" and "humanitarian causes."[5] Both of them, however, caused much lower tax losses than Warner.

Ultimately, these examples prove the district court's point: Warner is unique, and neither side's comparisons are very helpful. As a result, his sentence does not cause any *unwarranted* disparities among *similar* defendants. And for the same reason, it does not restrict the government's ability to obtain a prison sentence in other, more typical cases, even where the tax loss at issue is less than Warner's.

### 5. Choice of Sentence

The district court recognized that the various § 3553(a) factors "run in different directions" and that it was up to the court to "weigh … and balance them." In the end, it concluded that the mitigating factors outweighed the factors favoring incarceration, so it sentenced Warner to probation.

---

[5] *See United States v. Zabczuk*, No. 0:10-cr-60112-WPD (S.D. Fla.), sent. hr'g tr. at 4, 9, 22-23 (ECF No. 35); *United States v. Olenicoff*, No. 8:07-cr-00227-CJC (C.D. Cal.), plea agreement at 4-5 (ECF No. 11), sent. hr'g tr. at 4-6, 8-9, 23 (ECF No. 18).

No. 14-1330                                                    29

None of the errors that have led us to upend other sentences on substantive grounds are present here. In *England,* for example, the district court's sentence rested on a purported finding that the defendant would have attempted to murder the witnesses against him had he not been in custody. 555 F.3d at 621-22. That was nothing more than speculation, so we vacated the sentence. *Id.* at 623; s*ee also United States v. Bradley*, 628 F.3d 394, 399 (7th Cir. 2010) (per curiam) (where the judge assumed the defendant had committed undiscovered crimes and would commit more if released). Here, by contrast, the record amply supports the district court's factual findings.

We vacated the sentence in *United States v. Roberson* because of a legal error: the district court imposed a 1-month sentence for bank robbery to avoid an 84-month statutory minimum on a related firearm offense. 474 F.3d 432, 433-34 (7th Cir. 2007). A disagreement with Congress is not a valid basis to give a lenient sentence. *Id.* at 434-35. No such impermissible considerations intruded into the court's decision here, however.

We have also occasionally vacated sentences that were obviously unreasonable or arbitrary. In *United States v. Goldberg*, the district court gave a one-day sentence for child pornography based on "idiosyncratic penological views" that placed nearly exclusive emphasis on rehabilitation, rather than a "careful, impartial weighing of the statutory sentencing factors"; we reversed. 491 F.3d 668, 673-74 (7th Cir. 2007). In *Omole,* the court gave a sentence 51 months below the guidelines range, but that result "directly contradict[ed]" the court's finding that the defendant had "contempt for the court" and "utter lack of feeling for other human beings."

The court even told the defendant that "you've caught a break that I'm not at all sure you deserve." These contradictions compelled us to reverse. 523 F.3d at 698-700. And in *Repking*, which we discussed above, the court grossly overstated the impact of the defendant's unspecified good works and restitution payments. 467 F.3d at 1093, 1095-96.

By contrast, the district court's rationale here rests on specific facts about Warner rather than any peculiar penological theory; it is fully consistent with the sentence imposed; and the factors the court emphasized bear the weight it gave them.

This case more closely resembles *Wachowiak*, where we affirmed a below-guidelines prison sentence for receiving and sharing child pornography based on mitigating facts found by the district judge: the defendant never produced any images, showed genuine remorse, and could count on family support to help him through rehabilitation. In addition, like Warner, he had a clean record, "excellent" character (evidenced by testimony and letters), and a low risk of recidivism. 496 F.3d at 745-47. These factors were "particularized to the individual circumstances of the case"—as were Warner's. *Id.* at 750. Even though we might have been harsher, we concluded that the district court's decision fell within the range of reasonable sentences. *Id.* at 754-55.

The Supreme Court's decision in *Gall* is also instructive. The defendant there pled guilty to limited participation in an ecstasy distribution ring. The district judge sentenced him to three years' probation, well below the guidelines range of 30-37 months in prison. 552 U.S. at 41-45. The judge emphasized that the defendant had no significant criminal history, had voluntarily withdrawn from the conspiracy, and was

"doing everything in his power to forge a new life." *Id.* at 44. Additionally, a "small flood" of letters attested to his good character. *Id.* at 43. The Eighth Circuit thought the crime demanded a more serious sentence and reversed. The Supreme Court disagreed, holding that "the Court of Appeals should have given due deference to the District Court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence." *Id.* at 59-60.

Due deference leads us to the same conclusion here. Considering (1) Warner's excellent character, as shown by his long history of charity and kindness to others; (2) the isolated and uncharacteristic nature of his tax evasion; (3) his attempt to enter the OVDP; (4) his guilty plea and prompt payment of his liabilities; (5) his $53.6 million FBAR penalty, which is nearly ten times the tax loss; and (6) the fact that the government charged him with only one count and itself sought a well-below-guidelines sentence, we conclude that Warner's probationary sentence is reasonable.

## III. Conclusion

Because the district court did not abuse its considerable discretion, we AFFIRM Warner's sentence.

FLAUM, *Circuit Judge*, concurring in the judgment.

I concur in the judgment and write separately to express my considerable unease with the outcome of this appeal and the signal that it may send about how the criminal justice system treats wealthy tax evaders. In my view, Warner's commendable charitable spirit does not obviate the appropriateness of some period of incarceration. He purposely sought to deprive the federal government of millions of dollars of tax revenue simply to amass more of his enormous wealth. As Judge Kocoras put it, Warner's acts "go[] to the essence of how we govern ourselves." I agree wholeheartedly, and, therefore, Warner's non-custodial sentence—regardless of his philanthropy—causes me concern.

Nevertheless, we review the sentence imposed for an abuse of discretion. And the deference we afford the sentencing judge here must be informed by the leniency with which the government approached Warner's prosecution. Despite years of willful tax evasion, the government chose to charge Warner with just one count. And further, with a Sentencing Guidelines range of 46–57 months, the government recommended a relatively modest period of incarceration ("in excess of a year and a day"). For me, these two debatable acts of prosecutorial discretion point toward an affirmance in this case, as they provided a uniquely limiting context for the district judge's exceptional exercise of leniency. Without this backdrop, I would be inclined to vacate the sentence imposed and remand for resentencing. However, in light of a veteran jurist's thoughtful and thorough consideration of the case, I am compelled to conclude that Warner's

No. 14-1330                                      33

sentence falls within a sentencing judge's broad band of discretion.